In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2804

JACK V. SMITH,

*Plaintiff-Appellant*,

*v.*

JOHN M. DUFFEY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5238—**John W. Darrah**, *Judge*.

ARGUED MAY 11, 2009—DECIDED AUGUST 3, 2009

Before CUDAHY, POSNER and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff, Jack Smith, appeals from the dismissal, for failure to state a claim, of his diversity suit for fraud. Fed. R. Civ. P. 12(b)(6). The parties disagree on whether Illinois or North Carolina law governs the substantive issues, but as nothing turns on the dispute, because there is no material difference between the relevant laws of the two states, we ignore it.

In 1999 Smith sold a controlling interest in his medical-testing company, together with patents and other intellec-

tual property, to Dade Behring, Inc., a closely held corporation. As part of the consideration for the sale Smith received options, valid for ten years, to purchase 20,000 shares of Dade Behring's common stock at $60 a share. He also became an employee of the company. But the relationship soon soured and on May 3, 2002, he signed an agreement ending his employment. By the terms of the agreement he received $1.4 million in cash and retained his stock options with their $60 exercise price, although the appraised value of the stock was only $11.

Three months later the company declared bankruptcy under Chapter 11 of the Bankruptcy Code, and as part of the ensuing reorganization of the company Smith's stock options were extinguished. He sued three officers of Dade Behring (including its chief financial officer), who had negotiated the termination agreement with him and who he says knew that the company was planning to declare bankruptcy in a pre-packaged bankruptcy filing that would propose cancellation of the stock options. He contends that the defendants had a duty to disclose these facts to him. The reorganization was successful, and stock and stock options in the reorganized company were issued to the defendants, but of course not to Smith.

Smith argues that had they told him the company was planning to declare bankruptcy and that as a result his 20,000 stock options would be cancelled, he would have refused to sign the termination agreement unless he had been given more than $1.4 million to do so. He argues in the alternative that he should be entitled to the value of the shares in the reorganized company ($76 when he

sued) that he would have owned had he been issued (and exercised) stock options in the company on the same terms as the options he had owned before the reorganization. This alternative theory of damages is preposterous. Smith does not claim that the Chapter 11 reorganization was fraudulent (though he contends that the defendants hoped to profit from it by obtaining stock and stock options in the reorganized company), or otherwise invalid and so should not be deemed to have extinguished existing stock and stock options. The company was broke, and the extinction of equity interests is the usual consequence of bankruptcy. Smith could not have enforced his options once bankruptcy was declared, and he had no right to receive stock and options in the reorganized company and would not have had the right even if he had continued as an employee. Even if it's true, as he argues, that "if Smith had the ability to exercise the options he was granted under the [termination agreement], he would now realize a gain of approximately $10.9 million," the premise cannot be satisfied; he could not exercise the options because they were eliminated in a valid bankruptcy proceeding.

His complaint is not about the bankruptcy, but about the failure of the defendants, who for all we know were not acting with the company's knowledge or authorization, to tell him that the company would be declaring bankruptcy. The bankruptcy is not in issue in this case, which is why the defendants do not argue that the judgment in the bankruptcy case bars the plaintiff's claim.

Smith's only remotely plausible argument is that had the defendants told him the company was about to file for

bankruptcy he would have demanded and received more cash, in lieu of the stock options that were about to disappear. But how likely is that? And how could such pressure have been effective? Had the defendants told him the company was about to declare bankruptcy, he would have realized, if he didn't already, that his bargaining position was weak, because in bankruptcy he probably would get nothing at all. When two parties are trying to negotiate a contract, the one who if the contract is made will be the paying party will generally try to give the impression that he cannot afford to pay a very high price and that the other party therefore has little bargaining power. The defendants didn't try to do that, as they could have done by telling the plaintiff that the company was going to declare bankruptcy.

Nor is it argued that they would have been authorized by the company to increase the amount of cash that Smith would receive under the termination agreement had he expressed dissatisfaction with the $1.4 million cash settlement upon learning that the stock options had no value. Since, as he emphasizes, the defendants and their superiors in the company foresaw that all existing stock and stock options in the company would be extinguished in bankruptcy because it was a pre-packaged bankruptcy and extinction was part of the package, they would not have paid him anything to relinquish his stock in the termination agreement. Had he said to the defendants, "Well, since the options have no value, I am willing to relinquish them, but I want to be compensated for surrendering this valueless asset," they would have scratched their heads in puzzlement.

Thus the likeliest explanation of why the defendants did not tell Smith about the bankruptcy is that they assumed, and assumed he assumed, that the parlous state of the company—known to all and symbolized by the disparity between the appraised value of the stock ($11) and the exercise price of the stock options ($60)—made his retention of the stock options of no conceivable significance.

He does argue that the defendants expected the company to emerge from bankruptcy in fine shape; and indeed by the time he sued the value of the stock of the reorganized company had soared. But they were not required to share their hopes or expectations with him. When an alleged fraud consists of failing to tell the alleged victim something (in this case that the defendants' employer was about to declare bankruptcy) rather than telling him something that is untrue, he must show that there was a duty to tell him that something. Such a duty—call it the duty of candor—is sometimes imposed as a matter of law, as in the case of a fiduciary relationship. See, e.g., *Chiarella v. United States*, 445 U.S. 222, 227-28 (1980); *United States v. Holzer*, 816 F.2d 304, 307 (7th Cir. 1987); *In re Tallant*, 218 B.R. 58, 65 (9th Cir. BAP 1998); W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 106, pp. 738-39 (5th ed. 1984); *Restatement (Second) of Torts* § 551(2)(a) and comment f (1977). But often it arises in the absence of any special relationship—arises just because the defendant's silence would mislead the plaintiff because of something else that the defendant had said, *id.*, § 551(2)(b); *Union Pacific Resources Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584-86 (5th Cir. 2001); *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1324 (10th Cir. 1998);

*V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414-15 (1st Cir. 1985), or because of other circumstances, as in *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 675 (7th Cir. 2003). We held in that case that it was a fraud for a motel not to warn customers that their room was infested with bed bugs, since the customers would in the absence of warning have assumed it was not infested.

The case of a special relationship, such as the lawyer's fiduciary obligation to his client, is really just a special case of the general proposition that context can create a duty of candor. The lawyer's specialized knowledge invites the client to repose trust in what the lawyer tells him, and the client's expectation would be shattered if the lawyer could be uncandid with impunity, as is normal in arm's length dealings between buyers and sellers.

Had the defendants (or the company) told Smith that the company was doing great, so that he should be happy that the consideration he would receive under his termination agreement included stock options and so he should not ask for more cash, this would have put out of his mind any concern that the company might go broke and therefore his stock options become valueless. The defendants would then have been duty-bound to disabuse him of the misleading impression that they had created. But not only did they not say anything to lull him into thinking bankruptcy not in the cards; when they sent him the initial draft of the termination agreement they didn't bother to provide in it that he would retain his stock options—implying that they were worth too little to warrant mentioning. Rather than puffing up

the value of the options to make him reduce his demand for cash, they told him the company was in trouble and was seeking an "exit strategy"—of which bankruptcy is a common type—and that the stock options might indeed be worthless.

Smith places mysterious emphasis on the fact that shortly before the bankruptcy the company announced a 4 for 1 stock split. He says that this made the options worth more. What is true is that the exercise price of the options fell from $60 a share to $15 a share. But by the same token, since nothing had happened to make the company more valuable, the value of the underlying shares presumably fell by the same 75 percent. Smith's lawyer told us at argument that when a stock is split, the price of the new shares is the same as the price of the old. By this reasoning, when Dade Behring split each one of its shares into four shares the market capitalization of the company increased fourfold. No basis for such a strange theory of investor behavior is suggested.

He says he was *told* that the share price would be unaffected by the split. But no businessman in his right mind (and Smith is a businessman in his right mind) could believe this, and a false statement that the person to whom it is made could not believe, because its falsity was obvious to him given what else he knew, is not actionable as a fraud. *Field v. Mans*, 516 U.S. 59, 70-72 (1995); *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 74-75 (1st Cir. 1998); *Wittekamp v. Gulf & Western, Inc.*, 991 F.2d 1137, 1145 (3d Cir. 1993); *Schmidt v. Landfield*, 169 N.E.2d 229, 231-32 (Ill. 1960); *Chicago Title & Trust Co. v.*

*First Arlington National Bank*, 454 N.E.2d 723, 729 (Ill. App. 1983); *Restatement*, *supra*, § 541; Keeton et al., *supra*, § 108, p. 752 ("where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, . . . he is required to make an investigation of his own"). This rule is a check on phony claims; if a businessman claims that he bought the Brooklyn Bridge in response to a solicitation from someone who claimed to own the bridge, we know the claim is false.

Smith points to a promise in the agreement that no fact known to the company and not disclosed in writing to Smith "adversely affects or could reasonably be anticipated to adversely affect [the company's] performance" under the agreement or related documents. But the defendants are not parties to the agreement and therefore cannot be held liable for having violated it.

So the judgment of the district court must be affirmed. In our initial thinking about the case, however, we were reluctant to endorse the district court's citation of the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), fast becoming the citation *du jour* in Rule 12(b)(6) cases, as authority for the dismissal of this suit. The Court held that in complex litigation (the case itself was an antitrust suit) the defendant is not to be put to the cost of pretrial discovery—a cost that in complex litigation can be so steep as to coerce a settlement on terms favorable to the plaintiff even when his claim is very weak—unless the complaint says enough about the case

to permit an inference that it may well have real merit. The present case, however, is not complex. Were this suit to survive dismissal and proceed to the summary judgment stage, it would be unlikely to place on the defendants a heavy burden of compliance with demands for pretrial discovery. The parties did not negotiate face to face over the termination agreement, and though some of the negotiations were over the telephone rather than in letters or emails, Smith recorded those and the transcripts are attached to his complaint. So almost all the potentially relevant evidence is already in the record.

But *Bell Atlantic* was extended, a week after we heard oral argument in the present case, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)—over the dissent of Justice Souter, the author of the majority opinion in *Bell Atlantic*—to all cases, even a case (*Iqbal* itself) in which the court of appeals had "promise[d] petitioners minimally intrusive discovery." *Id*. at 1954. Yet *Iqbal* is special in its own way, because the defendants had pleaded a defense of official immunity and the Court said that the promise of minimally intrusive discovery "provides especially cold comfort in *this* pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties." *Id*. (emphasis added).

So maybe neither *Bell Atlantic* nor *Iqbal* governs here. It doesn't matter. It is apparent from the complaint and the plaintiff's arguments, without reference to anything else, that his case has no merit. That is enough to justify,

under any reasonable interpretation of Rule 12(b)(6), the dismissal of the suit.

AFFIRMED.