CITY OF SPRINGFIELD,
MASSACHUSETTS,
Plaintiff

v.

COMCAST CABLE COMMU-
NICATIONS, INC., et al.,
Defendants.

No. 09–CV–30074–MAP.

United States District Court,
D. Massachusetts.

Nov. 17, 2009.

Edward M. Pikula, Harry P. Carroll, City of Springfield, Law Department, Springfield, MA, for Plaintiff.

Steven P. Perlmutter, Robinson & Cole LLP, Boston, MA, for Plaintiff/Defendants.

Adam S. Caldwell, Elizabeth A. Drogula, Davis, Wright, Tremaine LLP, Washington, DC, Gregory P. Varga, Robinson & Cole LLP, Hartford, CT, for Defendants.

*MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION TO REMAND TO STATE COURT* (Dkt. Nos. 4 & 8)

PONSOR, District Judge.

## I. *INTRODUCTION*

On March 31, 2009 Plaintiff, City of Springfield, filed a ten-count complaint in the Superior Court of the Commonwealth of Massachusetts, charging Defendants, Comcast Cable Communications, Inc. and Comcast of Massachusetts II, Inc., (collectively "Comcast" or "Defendants"), with failing to honor certain financial commitments. After some preliminaries, Defendants timely removed the case to this court on the basis of diversity jurisdiction.

Plaintiff has now moved to remand, arguing that Defendants' decision to intervene in a separate administrative proceeding binds it to litigate only in state court and that, in any event, Defendants waived

their removal rights by filing certain motions in the Superior Court.

Defendants have moved to dismiss, on the grounds that Plaintiff's claims are preempted by federal law and, alternatively, that each count of the Complaint fails to state a claim under Rule 12(b)(6).

For the reasons stated below, Plaintiff's motion will be denied and Defendants' motion will be allowed, in part.

## II. STATUTORY, PROCEDURAL AND FACTUAL BACKGROUND

This memorandum will begin by addressing the general statutory framework, then turn to the relevant contracts, continue with a description of the pertinent administrative proceedings, and conclude with the procedural history of this case.

### A. Statutory Context

The Cable Act of 1992 grants the Federal Communications Commission ("FCC") the power, under certain circumstances, to regulate and determine reasonable rates for basic cable television services. See 47 U.S.C. § 543(b)(1). While establishing itself as the sole and exclusive source of regulatory authority, see 47 U.S.C. § 543(a)(1) ("[n]o Federal agency or State may regulate the rates for the provision of cable service except to the extent provided under this section . . . ."), the Cable Act commits the administration and enforcement of its regulations to local "franchising authorities." These authorities are governmental entities empowered by state or local law with authority in the area where the cable system operates. Id. Under this regime, a cable operator seeking an adjustment of cable rates must submit an application to its local "franchising authority", which in turn may approve or deny the adjustment in accordance with FCC regulations. 47 C.F.R. § 76.933.

In Massachusetts, the legislature has created an agency—the Department of Telecommunications and Cable (hereinafter "DTC")—to act as the Commonwealth's "franchising authority" under the Cable Act. See Mass. Gen. Laws ch. 166A, §§ 1 et seq.; Mass. Regs. Code. tit. 207, §§ 6.02 (2009). The Division of Community Antenna Television (hereinafter, "Cable Division") is a division of the DTC. See Mass. Gen. Laws ch. 166A, § 2.[1] The DTC is vested with jurisdiction over initial decisions on basic cable service rate disputes. Mass. Gen. Laws ch. 166A, § 15. Pursuant to federal law, cable companies operating in Massachusetts submit their rates to the DTC for review and approval. See, e.g., 47 C.F.R. §§ 76.922, 76.923; Mass. Regs. Code tit. 207, § 10.02(6) (2009) (requiring cable companies to make rate filings annually by March 15).

The Cable Act compels the FCC to promulgate regulations containing, inter alia, procedures by which franchising authorities may enforce regulations, including those by which disputes between cable operators and franchise authorities may be resolved. 47 U.S.C. § 543(b)(5). FCC regulation provides that the FCC is the "the sole forum" in which to appeal a franchising authority's ratemaking decision on the ground that the "franchising authority has acted [in]consistently with the

---

1. While the duties of the Massachusetts franchising authority have remained steady under the Cable Act, changes in state agency structures have resulted in some confusion as to terminology. The Code of Massachusetts Regulations continues to use the term "The Commission" to refer to the certified "franchising authority" in Massachusetts. See Mass. Regs. Code tit. 207, §§ 6.01 (2009). In this context, "the commission" and the DTC are synonymous. Pursuant to a 1997 legislative merger and a 2007 change of nomenclature, the "Cable Commission" became the "Cable Division" a division first of the Department of Public Utilities and ultimately of the Department of Telecommunications and

Cable Act or [rules adopted thereunder]." 47 C.F.R. § 76.944(a) (emphasis added). Where, however, a ratemaking appeal "do[es] *not* depend upon determining whether a franchising authority has acted consistently with the Cable Act," it may be heard in state or local courts. *Id.* (emphasis added). These regulations, among others, have been adopted by the DTC pursuant to Massachusetts state law. *See* 207 C.M.R. 6.01; Mass. Gen. Laws ch. 166A, § 15.

The Cable Act also contains a preemption clause, which reads in relevant part: "... any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this Chapter [47 U.S.C. §§ 151 *et seq.*] shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c).

### B.  *Contracts Underlying the Dispute*

#### 1.  *1997 Settlement Agreement*

In 1997, MediaOne,[2] the cable company serving the city of Springfield, apparently entered into certain negotiations relating to MediaOne's treatment of "Franchise Related Costs" ("FRCs").[3] On November 6, 1997, these negotiations resulted in a Settlement Agreement, which contained provisions governing how the company could "pass-through" FRCs to customers. Dkt. No. 1, Ex. A, Compl. ¶ 7. This Agreement was submitted for review to the Cable Division[4] which, pursuant to the Cable Act provisions outlined above, promulgated it as a statewide rate order with the force of law on November 13, 1997. ("Cable

Division Order"). Plaintiff claims that it did not know of this public order and did not know of the negotiations leading to its adoption.

#### 2.  *The Renewal License*

On August 7, 1998, Plaintiff renewed MediaOne's operating license. Compl. at ¶ 9 ("Renewal License"). The license was to last for ten years starting January 29, 2000. *Id.* at ¶ 11. The Renewal License provided that MediaOne would pay 5% of its gross revenues annually to Plaintiff as so called "in-kind" benefits (as opposed to cash payments for the license). *Id.* at ¶ 19. Section 8.1(d) of the Renewal License contained a provision ostensibly prohibiting MediaOne from passing on the costs of these benefits to consumers. Dkt. No. 1, Ex. A–5, Renewal License at § 8.1(d).

#### 3.  *The February Memorandum*

The parties' understanding of these and other provisions was memorialized in a February 1998 memorandum summarizing some of the more significant aspects of the parties' bargain. *See* Dkt. No. 1, Ex. A–6 ("the February Memorandum"). The memorandum explicitly stated that "[n]otwithstanding any law or regulation to the contrary, the City and MediaOne would waive any rights under applicable law to pass on the cost of in-kind benefits to City cable television subscribers ...." Compl. at ¶ 21. Another key part of the parties' bargain mentioned in the February memorandum was MediaOne's promise to expend certain funds for local purposes, primarily $300,000 for a community

---

Cable. *See* 1997 Mass. Acts ch. 43, §§ 113–29; 1997 Mass. Acts ch. 164, § 2; 2007 Mass. Acts ch. 19, § 49.

**2.**  MediaOne was eventually purchased by Defendant Comcast.

**3.**  The Complaint does not specify with whom MediaOne negotiated this agreement. Compl. at ¶ 4.

**4.**  The name of the governing franchising authority at the time that eventually became the DTC. See supra Note 1.

telecommunications center and additional funds to build a high-speed data network.

In December 2002, MediaOne was purchased by Defendant Comcast Cable Communications, Inc. ("Comcast"). Comcast changed MediaOne's name to Comcast of Massachusetts II, Inc. ("Comcast II"), the co-Defendant in this action. Following the acquisition, Defendants made annual rate filings to the DTC by March 15 of each year as required by state and federal law. DTC, as noted, had the power to approve any changes to basic cable television rates.

### C. *2007 Proceedings before the DTC*

In November and December 2007, Comcast petitioned the DTC for approval of its basic service rates, including its treatment of Franchise Related Costs ("FRCs"). Plaintiff intervened in these proceedings, arguing that Section 8.1(d) of the Renewal License prohibited Defendant from recovering any FRCs from customers.

Defendants countered that recovery of the FRCs did not constitute a "pass through" for purposes of Section 8.1(d) of the Renewal License because the 1997 Settlement Agreement, adopted as a public order by the state Cable Division, provided that as of January 2000 (the effective date of the Renewal License) any FRCs that had been historically passed through to subscribers would be deemed "embedded" in its basic service rates. Dkt. No. 5, Defs.' Mot. to Dismiss at 4. Thus, according to Defendants, a "pass through" would occur only if Defendants billed customers for any incremental increase in the FRCs. Defendants provided examples of this arrangement in the Settlement Agreement to the DTC. For instance, MediaOne's original license required it to provide $100,000 for local programming while the Renewal License required $150,000. Defendants argued that they were only pro-hibited from passing through the incremental $50,000 difference to customers.

After intervention before the DTC, Plaintiff Springfield contended that the Settlement Agreement did not govern the Renewal License and that the latter intended the term "pass through" in Section 8.1(d) of the latter agreement to apply to *any* FRCs billed to customers.

The DTC ultimately ruled for Defendants on two grounds. First, it agreed with Defendants' construction of the term "pass through" as covering only incremental increases in FRCs, finding that the Settlement Agreement governed the Renewal License, and defined "pass through" for the purposes of Section 8.1(d). It construed the Settlement Agreement and the Renewal License together and gave conclusive weight to § 9.12(a) of the Renewal License, which explicitly incorporated therein all "rules and regulations of the FCC and the Cable Division." *See* Compl. Ex. A–6 ("DTC Order") at 18. Since it was adopted as a public order by the Cable Division, the DTC determined that the Settlement Agreement was one of the "rules and regulations" of the Cable Division incorporated by reference into the Renewal License.

Second, the DTC gave conclusive weight to a provision of the Settlement Agreement that stated: "[t]he terms of the Agreement will be applied prospectively to all future MediaOne rate filings" and that the terms of the Agreement are "binding on MediaOne's franchises in the Commonwealth of Massachusetts." *Id.*

In sum, the DTC ruled that the Settlement Agreement, as a public rate order with the force of law, both informed and governed the subsequent Renewal License and that its definition of "pass through" as prohibiting Defendants from passing on only incremental increases in FRCs was controlling.

On Dec. 16, 2008, Plaintiff filed a complaint in state court seeking judicial review of the DTC's decision. That case is still pending before a Single Justice of the Supreme Judicial Court ("SJC"). *Springfield v. DTC*, No. SJ–2009–0052 (Mass.).

### D. *Procedural History of This Case*

On March 31, 2009, while the SJC appeal was pending, Plaintiff filed suit in Massachusetts state court. The ten-count complaint generally paired allegations of fraud and breach of contract with those that Defendants had wrongfully "passed through" to basic cable customers the costs of the contractual obligations incurred in connection with the Renewal License.

Defendants became aware of the state court suit on April 14, 2009. On May 1, 2009, Defendants filed a motion for extension of time to May 14, 2009 to file a responsive pleading, and on May 13, 2009, Defendants filed a motion to dismiss. On the same day, Defendants timely removed the litigation to this court on the basis of diversity jurisdiction.

## III. *DISCUSSION*

The court will turn first to Plaintiff's Motion to Remand and then to Defendants' Motion to Dismiss.

### A. *Motion to Remand*

Plaintiff's Motion to Remand rests on two arguments: (1) Defendants' Motion to Intervene in the separate state administrative proceedings before the DTC bound it to litigate only in state court; and (2) Defendants' decision to file motions in the State Superior Court phase of this case had the effect of waiving their right to remove on the basis of diversity. Neither of these arguments is persuasive.

■ As to Plaintiff's first argument, this court has found no authority (and Plaintiff cites none) supporting the proposition that Defendants' participation in the DTC rate appeal before the Single Justice in any way undermined its right to bring this separate litigation to federal court. "A waiver of the right to remove must be clear and unequivocal." *Tedford v. Warner–Lambert Co.*, 327 F.3d 423, 428 (5th Cir.2003). Certainly, there has been no "clear and unequivocal" indication that Defendants have waived their right to removal here.

■ As to Plaintiff's second argument—that Defendants waived their removal rights by their conduct in Superior Court—the law is clear that "the right to removal is not lost by participating in state court proceedings short of seeking an adjudication on the merits." *Tedford*, 327 F.3d at 428. Waiver "should only be found in extreme situations." *Grubb v. Donegal Mut. Ins. Co.*, 935 F.2d 57, 59 (4th Cir. 1991). "Where . . . a party takes necessary defensive action to avoid a judgment being entered automatically against him, such action does not manifest an intent to litigate in state court, and accordingly, does not waive the right to remove." *Resolution Trust Corp. v. Bayside Developers*, 43 F.3d 1230, 1240 (9th Cir.1995).

■ The motions to extend and dismiss filed in Superior Court manifestly constituted defensive actions designed to preserve Defendants' rights without the risk of entry of default due to missed deadlines. Indeed, Plaintiff itself concedes in its brief that "defendant's two prior state court motions in *Springfield v. DTC*, standing alone, *may be* insufficient to warrant remand." Dkt. No. 8–6, Plf's Mot. to Remand at 3 (emphasis added). The court would delete "may be" and insert "were." *Accord Cogdell v. Wyeth*, 366 F.3d 1245, 1249 (11th Cir.2004) (The filing of a motion

to dismiss prior to removing action did not amount to "substantial offensive or defensive actions in state court" constituting waiver of its right to remove); *Somoano v. Ryder Systems, Inc.*, 985 F.Supp. 1476, 1478 (S.D.Fla.1998) (holding that merely filing a motion to dismiss for failure to state a claim was not a waiver); *Hernandez–Lopez v. Puerto Rico*, 30 F.Supp.2d 205, 209 (D.P.R.1998) (same where removing party had filed an answer, a motion and memorandum, and a limited interrogatory).

In sum, there is no factual or legal basis for a finding of waiver, and Plaintiff's Motion to Remand will therefore be denied.

## B. *Defendants' Motion to Dismiss*

Defendants have moved to dismiss on two grounds: (1) the court lacks subject matter jurisdiction per Rule 12(b)(1) because Plaintiff's claims are preempted by federal law; and, in the alternative, (2) none of the counts of the Complaint states a claim for relief per Rule 12(b)(6).

For the reasons set forth below, the court declines to hold that the federal Ca-

ble Act and its attendant regulations necessarily preempt the state common law claims asserted by Plaintiff. While this issue is ably and extensively briefed by the parties, preemption analysis would demand a level of complexity unnecessary to rule on the motion before the court.[5] The doctrine of abstention provides a superior analytical tool, because it directly addresses the core problem here: the need to avoid overlapping decisional fora and to dispose of the issues raised by the parties in the most effective, efficient, and consistent manner.[6]

The court will abstain from adjudicating any claims that depend upon the meaning of terms contained in the Renewal License, Settlement Agreement, or the 1997 and 2007 DTC Orders, such as "pass-through" and "Franchise Related Costs." The meaning, scope, and application of these terms are the subject of active litigation before a Single Justice of the Supreme Judicial Court who is fully competent, indeed in a far better position, to adjudicate any and all claims of this sort.

---

**5.** The Cable Act's preemption clause supplants only those state laws "inconsistent with" the Act. 47 U.S.C. § 556(c). Were it to pursue application of the preemption doctrine, derived from the Supremacy Clause set forth in Article VI of the Constitution, the court would be required to determine whether state common law covers the same subject matter as the Cable Act in a manner that conflicts with the Act. *Residential Communs. Network of Mass., Inc. v. Commonwealth of Mass. Cable Television Comm'n*, No. 96–10881, 1996 WL 461485, at *6 (D.Mass., July 24, 1996) (Stearns, J.). This examination would inevitably require the court to make unnecessary rulings concerning any inconsistent overlap of Massachusetts common law with the Cable Act, in light of the Constitutional prohibitions, a roundabout journey to be avoided where possible. *See Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitution-

al question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

**6.** For similar reasons, the court will not address Defendants' argument under the doctrine of primary jurisdiction. This doctrine requires courts to defer to an administrative agency in the first instance when "the issue involves technical questions of fact uniquely within the expertise and experience of an agency." *Liability Investigative Fund Effort, Inc. v. Medical Malpractice Joint Underwriting Ass'n of Mass.*, 409 Mass. 734, 569 N.E.2d 797, 807 (1991) (quoting *Casey v. Massachusetts Electric Co.*, 392 Mass. 876, 467 N.E.2d 1358, 1361 (1984)). The doctrine does not apply where, as here, the court rules on jurisdictional grounds and the surviving counts of the complaint sound purely in contract. Moreover, the primary jurisdiction argument is before the Single Justice.

It is well-established that the court may raise and apply abstention doctrine *sua sponte*. *Rivera–Feliciano, et al. v. Acevedo–Vila, et al.*, 438 F.3d 50, 59–60 (1st Cir.2006) (citing *Bellotti v. Baird*, 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)) ("It would appear that abstention may be raised by the court *sua sponte*."); *Ford Motor Co. v. Meredith Motor Co.*, 257 F.3d 67, 71 n.3 (1st Cir. 2001); *Massachusetts v. Azubuko*, 616 F.Supp.2d 174, 177 (D.Mass.2009) (raising *sua sponte* the issue of abstention). Further, it is "well settled that a district court is 'under no compulsion to exercise [its] jurisdiction,' ... where the controversy may be settled more expeditiously in state court...." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 662–63, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978) (quoting *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942)).

In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court held that in certain circumstances, a federal court may abstain from hearing a claim "due to the presence of a concurrent state proceeding for reasons of wise judicial administration." *Id.* The "conservation of judicial resources and comprehensive disposition of litigation" are core federal policies underlying *Colorado River* abstention. *Id.* at 817, 96 S.Ct. 1236 (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)).

The First Circuit has identified a non-exhaustive list of factors for district courts to consider when determining whether to apply *Colorado River* abstention. No one factor is "necessarily determinative." *KPS & Assocs. v. Designs by FMC, Inc.*, 318 F.3d 1, 10 (1st Cir.2003). A court may consider:

(1) whether either court has assumed jurisdiction over a *res;* (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*United States v. Fairway Capital Corp.*, 483 F.3d 34, 40 (1st Cir.2007) (citation omitted).

■ Applying these factors, three undisputed facts in this case weigh decidedly in favor of abstention: (1) the DTC has ruled upon the meaning of "pass through" and "Franchise Related Costs," terms that are crucial to Counts I, III, V, VI, VII and IX of Plaintiff's Complaint; (2) all rate-determinative issues are already before the state court on appeal; and (3) if it prevails, Plaintiff will be able to achieve a complete remedy before the Single Justice. If the state court accepts Plaintiff's interpretation of the rate-determinative terms, then it can remand the matter to the DTC, which will then make a ruling favorable to Plaintiff. At that point, as the parties conceded at oral argument, Plaintiff will be able to recover for any overcharges caused by Defendants' improper pass-through of FRCs.

Given these circumstances, the doctrine of sound judicial administration underlying *Colorado River* deferral is keenly implicated. Significantly, the balance of the factors—the inconvenience of the federal forum, the possible vexatiousness of Plaintiff's federal claim, and the policies underlying removal—do little to tip the scales in favor of this court adjudicating the Counts of the Complaint dependent upon rate-determinative terms. Accordingly, the

court will abstain from adjudicating Claims I, III, V, VI, VII and IX which necessarily turn on issues first raised and currently pending before the Single Justice.

■ Counts II, IV, VIII, and X, on the other hand, do not depend upon the meaning of rate-determinative terms and thus do not affect the "rate structure" set by the DTC and FCC. Instead, they allege that Defendants simply did not deliver on their promise to provide certain in-kind benefits, including $300,000 for a local telecommunications center and high-speed data network, as required by the Renewal License. The provision of these goods and services has no impact upon the rates Defendants are allowed to charge. While allocating the burden of paying for these services may be a rate-structure issue, the fundamental questions regarding the obligation may be addressed straightforwardly by this court as matters of contract interpretation and good faith in the dealings of the parties.

Defendants' arguments anchored on Fed. R. Civ. 12(b)(6) to avoid this adjudication are not persuasive. It is axiomatic that, when confronted with a motion to dismiss for failure to state a claim, the court must accept the well-pled allegations on the face of the complaint as true and simply determine whether a plaintiff has pled enough facts to render its claims "plausible on [their] face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).[7]

Preliminarily, Defendants argue that Plaintiff has asserted claims in violation of the applicable statutes of limitation. Since all counts surviving the court's application of the abstention doctrine sound in contract, this argument is unavailing.

As the First Circuit has held:

The statute of limitations in an action for breach of contract in Massachusetts is six years. When the statute of limitations for a breach of contract begins to run depends on whether the contract is entire or divisible. If an obligation is payable in installments, the statute of limitations begins to run against the recovery of each installment from the time it becomes due. The rule applies even where one contract provides all the terms of the agreement between the parties, so long as the contract requires that the payments be made in installments. A contract need not specifically reference installments to be deemed an installment contract.

*Berezin v. Regency Sav. Bank*, 234 F.3d 68, 73 (1st Cir.2000).

■ In this case, Plaintiff has alleged that Defendants breached their ongoing

---

7. The court notes that *Twombly* 's "plausibility" test may not govern here. As Judge Posner, writing for a unanimous panel of the Seventh Circuit recently stated in *dicta*, *Twombly* and its progeny should apply only in two situations: (1) highly complex cases where a skeletal complaint and the burden of pre-trial discovery would effectively coerce settlement by defendants; and (2) cases in which an official immunity or other bar to suit would be obviated by extensive discovery. *Smith v. Duffey*, 576 F.3d 336, 340 (7th Cir. 2009) (discussing *Twombly*, 550 U.S. 544, 127 S.Ct. 1955 and *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). This is neither a complex case nor one in which an official immunity is asserted. However, while the classic *Conley* pleading standards may still survive, the court will assume without deciding that the *Twombly* rule applies here because the parties have not briefed the issue. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (discussing "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief").

obligations to provide, *inter alia,* a community center and communications network; in-kind benefits to be paid in installments. Thus, the date of accrual was the date of the latest breach—well within the six-year limitations period.

With the statute of limitations arguments unavailable, Plaintiff's contract-based counts easily survive Defendants' 12(b)(6) motion. In Count II of the Complaint, Plaintiff alleges that Defendants breached the parties' contract by failing to provide a $300,000 Telecommunications Equipment Package to a community center. Defendants offer the fact-based rejoinder that they have fulfilled their contractual obligations and have given Plaintiff proof of this. In response, Plaintiff argues only that Defendants' "proof" references materials outside of the pleadings, namely an equipment list provided to Plaintiff.[8]

■ To sustain a cause of action for breach of contract, Plaintiff must demonstrate: (1) that the parties reached a valid and binding agreement regarding the equipment package; (2) that Defendants breached the contract by not providing the package; and (3) Plaintiff suffered damages from the breach. *See Michelson v. Digital Fin. Svcs.,* 167 F.3d 715, 720 (1st Cir.1999).

Though these allegations may not survive summary judgment, Plaintiff has alleged each element sufficiently to raise a "plausible" claim for relief and the court will not dismiss Count II before the parties have taken discovery.

■ In Count IV, Plaintiff alleges that Defendants failed to "fully fund" the Community Telecommunications Center be-cause it did not actually "expend" the required $300,000. Defendants argue that the relevant contract clause obligates them to "maintain" $300,000 "for the operation of the Center." Thus, the argument runs, Defendants were not required to spend the money in times when there was too little local demand for local programming and services.

Again, the allegations in the complaint are sufficiently definite to raise a "plausible" claim for relief. The question of whether Defendants were required to "expend" or simply "maintain" a $300,000 budget speaks to the intention of the parties at the time the Renewal License was negotiated and signed. The sufficiency of the record to support Plaintiff's version of the facts may be litigated at the summary judgment stage and is not properly resolved at the motion to dismiss stage.

■ Count VIII alleges that Defendants acted in bad faith by failing to spend the $300,000 as promised and by passing through the costs of the Telecommunications Package to customers. Count X alleges breach of warranty on the same grounds. Defendants contend that these counts restate the breach of contract claims and are preempted to the extent they rely upon matters before the DTC and FCC.

"The covenant of good faith and fair dealing, implied in every contract under Massachusetts law, may be breached ... upon conduct by defendant that deprives plaintiff of the intended 'fruits' of the contract." *Linton v. New York Life Ins. & Annuity Corp.,* 392 F.Supp.2d 39, 42 (D.Mass.2005) (citation omitted). The "covenant operates 'to guarantee that the

---

8. The court declines to exercise its discretion to convert Defendants' motion into a motion for summary judgment on Count II. Fed. R.Civ.P. 12(b)(6). At any rate, there clearly exists, at a minimum, a disputed issue of material fact as to the adequacy of Defendants' alleged proof of payment. Fed. R.Civ.P. 56(c).

**110**

parties remain faithful to the intended and agreed expectations of the parties and their performance.'" *Id.* (citations omitted). Plaintiff's breach of warranty claim sounds in contract.

Since Plaintiff's breach of contract claims survive, these counts do as well. They allege violations of duties undertaken by Defendants either expressly or by implication upon entering into the Renewal License with Plaintiff.

## IV. *CONCLUSION*

For the foregoing reasons, Plaintiff's Motion to Remand (Dkt. No. 8) is hereby DENIED and Defendants' Motion to Dismiss (Dkt. No. 4) is hereby ALLOWED IN PART. The Motion to Dismiss is ALLOWED as to Counts I, III, V, VI, VII, and IX of the Complaint. The Motion to Dismiss is DENIED as to Counts II, IV, VIII, and X.

The case is hereby referred to Magistrate Judge Kenneth P. Neiman for a scheduling conference pursuant to Fed. R.Civ.P. 16.

It is So Ordered.