In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-2246 & 04-2368

EMILIANO HERNANDEZ,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

MICHAEL F. SHEAHAN, Sheriff
of Cook County, and
CITY OF CHICAGO,

*Defendants-Appellants,*
*Cross-Appellees.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 99 C 6441—**John F. Grady**, *Judge.*

ARGUED APRIL 10, 2006—DECIDED JULY 26, 2006

Before EASTERBROOK, RIPPLE, and WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* On June 9, 1999, police in Chicago stopped Emiliano Hernandez for running a stop sign. He was not carrying a driver's license and lacked proof of insurance. A check from the squad car revealed that his license had been suspended. Through this check the officers learned the number of Hernandez's driver's license, which they used to inquire about his criminal record. The Law Enforcement Agencies Data

System database reported that the person assigned to that license number, Enrique Hernandez, was wanted on an outstanding warrant. Deeming "Enrique" and "Emiliano" to be aliases for a single person, the police took Hernandez into custody. No one noticed that one digit of Emiliano's driver's license (an Illinois license has one letter and 11 numerals) had been mistyped on the squad car's terminal. Enrique Hernandez, the wanted man, is a different person—though the birthdays of Enrique and Emiliano are identical and their physical characteristics match (an Illinois license records sex, height, weight, and eye color, all of which tallied).

At the stationhouse police brushed off Hernandez's contention that he is not the fugitive "Enrique Hernandez." They took him to court the morning of June 10. A lawyer was appointed to represent Hernandez, who pleaded guilty to three traffic infractions: failing to stop at a stop sign, driving after his license had been suspended, and driving without insurance. Judge Thomas O'Hara, presiding in traffic court, then remanded Hernandez to the Sheriff's custody so that he could be arraigned in the criminal court on the charge that led to the warrant. That afternoon Hernandez (supported by his wife, who presented his passport and Social Security card) again insisted that he is not the man named in the warrant. Like the police before them, the Sheriff's deputies refused to listen and informed Hernandez that this was a matter for the judge.

The very next morning Hernandez was back in court, before Judge Thomas Carmody, who called him "Enrique Hernandez." He did not protest. Indeed, neither Hernandez nor his lawyer ever argued to either Judge O'Hara or Judge Carmody that Enrique and Emiliano Hernandez are different persons. Judge Carmody set bond at $5,000 and returned Hernandez to the Sheriff's custody pending the next hearing, scheduled for July 1. On June 24 Hernandez was released on bail. (He would have been released earlier

but for a gaffe that made desk officials at the jail think that the judge had denied his motion for bail; that error is no longer at issue.) During the period between June 11 and June 24 deputies continued to rebuff Hernandez's insistence that he is not the wanted Enrique; the deputies took the view that they had an obligation to produce him in court on July 1 and were going to hold him, unless bailed out, no matter what arguments and documents he and his family presented. Whether he was to be detained in the interim, the deputies maintained, was a decision already made by a judge.

While Hernandez was out on bond the prosecutor realized that an error had occurred and dismissed the pending charge. In this suit under 42 U.S.C. §1983 Hernandez contends that both the police and the deputies violated the Constitution's fourth amendment (applied to the states by the fourteenth) and the due process clause of the fourteenth amendment by refusing to entertain his claim of erroneous identification. The only remaining defendants are the City and the Sheriff's Department, however, and units of government can be liable under §1983 only for unconstitutional policies, as opposed to errors in the implementation of valid policies. See *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court granted summary judgment in the City's favor, ruling that its policy (which we describe later) is lawful. But the Sheriff's policy of refusing to entertain claims of mistaken identification violates the Constitution, the judge concluded. A jury awarded Hernandez $750,000 in damages for the time he had spent in the Sheriff's custody. The Sheriff appeals from that decision, and Hernandez cross-appeals from the judgment in Chicago's favor. We start with Hernandez's appeal.

Chicago contends that there are at least two obstacles to Hernandez's claim, even if (as he maintains, and the City

denies) the police turned a deaf ear to his entreaties. First, custody between the arrest on June 9 and the initial appearance before a judge on June 10 was justified whether or not Hernandez is the person wanted on the warrant. He had committed three traffic offenses, and the police therefore were entitled to hold him until his appearance in court. The Constitution permits custodial arrests even when the sole authorized punishment is a fine. See *Atwater v. Lago Vista*, 532 U.S. 318 (2001). Hernandez therefore does not contest his initial custody. (The police could not have let him drive home, as he lacked a valid license.) The fourth amendment allows the police up to 48 hours to take a suspect to court, see *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), and Chicago's police used only 12 (for Hernandez had been arrested the evening of June 9, while traffic court was closed). From the time of Hernandez's appearance in court, the matter was out of Chicago's hands.

Second, Chicago requires its police to verify that the person in custody is the one named in a warrant. Arresting officers must submit reports with identifying details. The desk sergeant then must check with the Central Warrant Unit to determine that the wanted person matches the person in custody. Any discrepancies must be submitted to the watch commander for resolution. It is true, as Hernandez emphasizes, that Chicago does not require the police to accept identifying information submitted by relatives, but that is understandable. Given the number of people who use aliases, and the ease with which many documents can be faked, a police department is not required to be credulous but may limit its attention to information it deems reliable—especially because detention on the police department's resolution cannot exceed 48 hours. Police are entitled to act on information that may be inaccurate and let the courts determine whether to credit a suspect's claim of innocence. See, e.g., *Askew v. Chicago*, 440 F.3d 894 (7th Cir. 2006); *Gramenos v. Jewel Companies,*

*Inc.*, 797 F.2d 432 (7th Cir. 1986). All the police need is probable cause, which is well short of certainty. Like a grand jury, see *United States v. Williams*, 504 U.S. 36 (1992), police may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence.

Perhaps the police failed to live up to their obligations under the City's procedures. But *Monell* establishes that an operational error does not support municipal liability. Hernandez contends that, if double checking (which the City requires) does not prevent mistakes, then the Constitution must require triple checking. That argument, however, was rejected in *Baker v. McCollan*, 443 U.S. 137 (1979), which held that an arrest based on a mistaken identification does not lead to liability in damages if the suspect is taken to court promptly. *Baker*, like this case, concerned an arrest of one person on a warrant meant for someone else. Hernandez insists that *Baker* is not controlling because that warrant gave the full name of the person who was to be arrested (a mistake had been made in filling out the warrant), while "Emiliano" and "Enrique" differ. But that misses the point: Chicago's police thought (and not without reason, given the identical birthdates and physical characteristics) that these were two names for one person. *Baker* is not limited to same-name misidentifications. The Supreme Court established a broader constitutional rule:

> Absent an attack on the validity of the warrant under which he was arrested, respondent's complaint is simply that despite his protests of mistaken identity, he was detained in the Potter County jail from December 30, when Potter County deputies retrieved him from Dallas, until January 2, when the validity of his protests was ascertained. Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution. Re-

> spondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment. Obviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. . . . We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law." But we are quite certain that a detention of [one business day] . . . does not and could not amount to such a deprivation.

443 U.S. at 143-45 (footnote omitted). Given *Baker*, there is no constitutional infirmity in Chicago's policy.

*Baker* does not necessarily carry the day for the Sheriff, because his staff held Hernandez for 15 days, substantially beyond the period that the Court dealt with in *Baker*. But the Sheriff's role also is easier to justify, because Hernandez had been to court first. (This case is not remotely like *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), on which Hernandez relies: In *Armstrong* an error caused a sheriff to imprison for almost two months someone who had *never* been to court.) That the deputies acted after the judicial appearance leads the Sheriff to invoke what he calls "quasi-judicial immunity." After all, the deputies were just carrying out the judge's orders. They aren't themselves judges (hence the "quasi"), but they were the judge's instruments.

That argument won't wash, again for two reasons. First, units of government are not entitled to immunity in suits

under §1983. Official immunities (judicial, legislative, absolute, qualified, quasi, and so on) are personal defenses designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability under vague and hard-to-foresee constitutional doctrines. That justification does not apply to suits against units of state or local government, which can tap the public fisc. *Owen v. City of Independence*, 445 U.S. 622 (1980), holds that governmental bodies whose own policies are unconstitutional cannot obtain a derivative benefit from the qualified immunity that may protect their employees. That decision did not entail a claim of "quasi-judicial immunity," but we cannot see any reason why a governmental entity would be entitled to one kind of immunity but not another.

Second, an invocation of "quasi-judicial immunity" begs the question. Hernandez maintains that the Constitution requires jailers to investigate claims of misidentification even after a judge has remanded the suspect to custody. If that is true, then the judge's initial order awarding custody to the Sheriff's department can't be dispositive. Maybe if the judge *forbade* the Sheriff's department to continue checking on identity there would be immunity (at least for the deputies personally): they ought not be put to a choice between penalties for contempt of court and damages under §1983. The collateral-bar doctrine, which provides that injunctions must be obeyed (even if constitutionally infirm) until stayed or reversed by a higher court, see *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 439 (1976), would block an award of damages against a public official who carried out a direct command of a judge, made in a case over which the court had jurisdiction. Judge Carmody, however, did not forbid all additional inquiries into Hernandez's identity. The Constitution may not require such inquiries after the arraignment, but that concerns the merit of Hernandez's contentions and not any form of immunity.

The Sheriff's policy is simple: Ignore all claims of mis-identification (and any other version of the assertion that a suspect is innocent). It is the same policy that Tommy Lee Jones (portraying a U.S. Marshal) announced in *The Fugitive* when Harrison Ford's character proclaimed his innocence: "I don't care." A judge had committed Ford's character to prison, and that was that. We hold that it is an entirely lawful policy unless the custodian knows that the judge refuses to make an independent decision or there is doubt about which person the judge ordered held. It is possible to imagine a local judge saying something like "I'll detain anyone the prosecutor wants me to." In former times, it was possible to imagine a judge saying that all black suspects will be bound over for trial no matter what the evidence shows. But Hernandez does not contend that the Circuit Court of Cook County in general, or Judge Carmody in particular, delegates judicial power to the executive branch. He can't contend that the judge abdicated responsibility in his individual case because, as we have mentioned, he never asked the court to consider whether Enrique and Emiliano Hernandez are different people. And Judge Carmody did not tell the Sheriff's office: "Go find Enrique Hernandez and keep him in custody until July 1." He told the Sheriff to hold *plaintiff*, in particular. Every detainee in the Sheriff's custody has his hand stamped with a number. Judge Carmody instructed the Sheriff to maintain custody of a particular person with a particular number, and there is no doubt that Emiliano Hernandez is that person.

Hernandez's claim against the Sheriff rests on the due process clause, because the fourth amendment drops out of the picture following a person's initial appearance in court. See *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Gauger v. Hendle*, 349 F.3d 354, 362-63 (7th Cir. 2003). The due process clause entitles a person to an opportunity for a hearing that is sufficiently accurate to support the gravity of the deprivation. What is required for a criminal conviction considerably exceeds what is required for,

say, a brief suspension from high school. See *Goss v. Lopez*, 419 U.S. 565 (1975); Henry J. Friendly, "*Some Kind of Hearing*", 123 U. Pa. L. Rev. 1267 (1975). The familiar formula from *Mathews v. Eldridge*, 424 U.S. 319 (1976), specifies that, when evaluating the constitutional adequacy of a decision-making process, the court must consider the weight of the interest at stake, the risk of error, and the costs of additional process.

The interest in liberty is a weighty one, but its duration in situations of this kind is limited: at stake for Hernandez was custody until the next appearance (scheduled for July 1), and perhaps much less (depending on when bond could be posted). The risk of error entailed in a rule that judicial decisions will not be re-examined appears to be slight. Hernandez did not offer any evidence (or point to any scholarly study) suggesting that state judges regularly order jailers to hold the wrong person. For all this record shows, Hernandez is one case in 10,000, and there would not have been an error in his situation either had he or his lawyer only raised the subject before Judge Carmody. (It is not a Sheriff's job to investigate and redress claims of ineffective assistance of counsel.) And the costs of using additional process could be substantial. The value of deputies' time is not the main potential cost. Instead the major cost arises from the risk of error.

The rule that Hernandez wants the Sheriff to follow, under which every deputy must be open to persuasion for as long as a person is in custody, would create a substantial possibility that by presenting his contention over and over even a guilty suspect would eventually find a deputy who did not understand the weight of the evidence and let him go. That would frustrate the public interest in carrying out the criminal law. To appreciate the risk of error, one has only to consider the point that Hernandez and his wife made: that very reliable documents (such as a passport) demonstrate that his first name is Emiliano. Yet that's only

half the equation. What if Emiliano were indeed the wanted man, but the warrant was in the name of Enrique because Hernandez had put an alias over on the police and prosecutor responsible for the warrant? Sooner or later a prisoner and his family might find a jailer who did not appreciate that the validity of *both* names (and other details) must be pinned down before it is possible to know whether Emiliano and Enrique Hernandez are the same person. A jailer who did not understand this would make an error, and the error would prove irreparable if the wanted person could not be recaptured.

The Sheriff's policy is the norm: ensure *one* hearing and abide by its outcome. State or federal law may offer the opportunity for extra hearings; think only of the way in which federal courts engage in collateral review of state criminal convictions. Whether and when a claim of actual innocence (despite a formal conviction) requires more judicial proceedings remains a contentious subject. See, e.g., *House v. Bell*, 126 S. Ct. 2064 (2006); *Herrera v. Collins*, 506 U.S. 390 (1993). But everyone assumes that, to the extent such claims must be entertained, the obligation rests on the judiciary rather than the jailer. Hernandez has not identified, and we are not aware of, any decision by the Supreme Court (or any court of appeals) holding that employees of the executive branch must hold a second hearing to decide whether to implement decisions taken by the judicial branch at an initial hearing.

If there were deficiencies in the hearing that the Circuit Court of Cook County offered Hernandez on June 11, then the right response would have been for his lawyer to insist that a better decision be made, and to appeal if the judge refused. There is no basis for an award of damages against executive officials whose policy is to carry out the judge's orders.

The judgment is affirmed on Hernandez's appeal and reversed on the Sheriff's.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*