# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2998

BRANDIE ATKINS, as administrator of the estate of
William O. Atkins, deceased,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6109—**Milton I. Shadur**, *Judge*.

ARGUED SEPTEMBER 8, 2010—DECIDED JANUARY 25, 2011

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. This is the second appeal from
the dismissal of a federal civil rights suit. 42 U.S.C. § 1983.
The district court initially dismissed it under Rule 25(a)(1)
of the Federal Rules of Civil Procedure, on the ground
that the motion to substitute the plaintiff's widow
for the (original) plaintiff, who died while the suit was
pending, was untimely. We reversed, 547 F.3d 869 (7th

Cir. 2008), instructing the district judge to allow the substitution. That kept the case alive, but the judge has again dismissed it, this time on the merits—he ruled that the complaint failed to state a claim. Hence this second appeal.

In October 2003 Chicago police stopped a car in which William O. Atkins, the plaintiff's decedent, was a passenger, and arrested him on the strength of a parole-violation warrant bearing the name "William Atkins." He was held at the police station overnight and then transferred to the custody of the Illinois Department of Corrections, which placed him in Stateville prison. From the moment of his arrest he steadfastly denied that he was the William Atkins named in the warrant, but alternatively and inconsistently claimed that he was indeed the same Atkins but that his parole had expired, so that he could not have violated it—which seems in fact to be the case.

Released from the Department's custody after 37 days when the parole board acknowledged that he was being detained in error, Atkins sued the arresting officers, who are employees of the City of Chicago, plus the City itself, prison guards at Stateville, and other employees of the Department of Corrections. The state defendants are accused of having unjustifiably protracted a mistaken detention and imposed impermissible hardships during the detention, all in violation of rights conferred by the due process clause of the Fourteenth Amendment. The charge against the City defendants is that the arrest was unconstitutional be-

cause it was not based on probable cause; and we'll start there.

When arrested, Atkins denied that he was the William Atkins named in the warrant and noted discrepancies between his identifying characteristics and the description in the warrant. Although both Atkinses were of the same race and sex and had the same first and last names, our William Atkins was slightly taller and somewhat heavier than the person described in the warrant and had a middle initial, which the name on the warrant lacked. But oddly—if they were different people—the month and day of their birth (though not the year) were the same and the first three digits of their social security numbers were also the same.

The police did not have probable cause to stop the vehicle in which our William Atkins was riding, but clearly if he was the William Atkins named in the warrant the illegality of the stop did not invalidate the arrest. *United States v. Johnson*, 383 F.3d 538, 544-45 (7th Cir. 2004); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997); contra, *United States v. Lopez*, 443 F.3d 1280, 1285-86 (10th Cir. 2006). In *Green* we said the question was whether "the causal chain has been sufficiently attenuated to dissipate the taint of the illegal conduct," 111 F.3d at 521, and in like vein in *Johnson* we considered whether "a lawful arrest based on any outstanding warrant for a passenger in the vehicle constituted an intervening circumstance that dissipated any taint caused by an initial traffic stop that had lacked reasonable suspicion," 383 F.3d at 544, and concluded that it did. But a simpler way to justify

the result in those cases (and this one), without talking about "taints" and "dissipation" and "intervening circumstances" (and what do those terms mean, really?), is to note simply that the arrest was based on a valid warrant rather than on anything turned up in the illegal search. If police stopped cars randomly, looking for persons against whom there were outstanding warrants, the drivers and passengers not named in warrants would have good Fourth Amendment claims. But a person named in a valid warrant has no right to be at large, and so suffers no infringement of his rights when he is apprehended unless some other right of his is infringed, as would be the case had the police roughed up Atkins gratuitously in the course of trying to determine whether he was the person named in the warrant. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Catlin v. City of Wheaton*, 574 F.3d 361, 366 (7th Cir. 2009); *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc). But that is not the plaintiff's complaint.

Yet in the course of making an arrest on the basis of an outstanding warrant the police may learn something that shows that the warrant does not actually create probable cause to arrest the person they're arresting—suppose the warrant in this case had identified the person to be arrested as a woman, named Wanda Atkinson. The police would know at a glance that the William Atkins they were about to arrest was not the person named in the warrant and if they arrested him anyway it would be an illegal arrest because the mistake would not be "understandable" or "the arrest a reasonable response to the situation facing them at the

time." *Hill v. California*, 401 U.S. 797, 804 (1971). As nearly as we can determine, the police who made the arrest made no mistake, as distinct from whoever failed to notice that Atkins's parole had expired before his alleged violation of it. And if the police did make a mistake, it was a reasonable one.

Anyway the plaintiff's real complaint is not about the initial error but about the time it took to correct it—the state defendants are thus the main target. Atkins was transferred from the Cook County jail to Stateville within a day of his arrest, but it was another 36 days before the prison released him, having finally satisfied itself that he was not a parole violator. The complaint alleges that he protested continuously against his detention.

Due process requires government to follow reasonable procedures for minimizing mistaken deprivations of liberty. In determining what is reasonable "the court must consider the weight of the interest at stake, the risk of error, and the costs of additional process." *Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006); see *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976); cf. *Sutton v. City of Milwaukee*, 672 F.2d 644, 645-47 (7th Cir. 1982). The interest in liberty increases in weight the longer a person is detained, and the accuracy of the procedures for avoiding mistaken detentions that is constitutionally required increases concomitantly. In the case of persons arrested for violating parole, a preliminary hearing to determine probable cause must be conducted "as promptly as convenient after arrest while information is

fresh and sources are available," and a plenary hearing must be held within a "reasonable time after the parolee is taken into custody"—normally two months. *Morrisey v. Brewer*, 408 U.S. 471, 484-88 (1972). Parole proceedings are traditionally administrative rather than judicial, so the hearing need not be held before a judicial officer. *Id.* at 486. Illinois's procedures, codified at 20 Ill. Admin. Code § 1610.140, comply with the standard set forth in the *Morrisey* case. *Faheem-El v. Klincar*, 841 F.2d 712, 722-23 (7th Cir. 1988) (en banc).

Atkins had a preliminary hearing on the seventh day after his arrest but failed to persuade the hearing officer that it was a case of misidentification. He muddied the waters by arguing that he should be released because his parole had expired. Probably it *had* expired, but to offer contradictory grounds was bound to arouse the hearing officer's suspicion. Alternative pleading is permissible but a person who says both that I am not the *X* named in the parole-violation warrant and I am that *X* but my parole expired is calling himself a liar. The hearing officer's failure to find misidentification thus was reasonable.

The full hearing took place 29 days later, and Atkins was released on that day. The delay was well within the two-month deadline set by the *Brewer* case. The plaintiff contends that guards and miscellaneous prison staff have a continuing constitutional duty, even when there are constitutionally adequate formal administrative remedies against unjustified imprisonment, to conduct an exhaustive investigation of a prisoner's claim

of misidentification. Prisons would be unmanageable if the contention were accepted. "Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury." *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979). We have rejected a rule "under which every deputy [sheriff] must be open to persuasion for as long as a person is in custody." *Hernandez v. Sheahan*, *supra*, 455 F.3d at 777. Such a rule "would create a substantial possibility that by presenting his contention over and over even a guilty suspect would eventually find a deputy who did not understand the weight of the evidence and let him go. That would frustrate the public interest in carrying out the criminal law." *Id*.; see also *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006); *Pasiewicz v. Lake County Forest Preserve District*, 270 F.3d 520, 524 (7th Cir. 2001).

One could argue for drawing a distinction between a person arrested for a parole violation who denies he violated his parole and a person arrested for a parole violation who denies that he is the person named in the arrest warrant. The fact that parole violations are adjudi-

cated administratively is one of the terms of parole, and by accepting parole a prisoner accepts the procedures, held constitutional by the Supreme Court, for adjudicating parole violations. "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." *Morrissey v. Brewer*, *supra*, 408 U.S. at 480. But a person arrested for a parole violation who had not actually been named in the arrest warrant—who might never have been convicted of a crime, and therefore never have been paroled, in his life—is not someone who accepted administrative adjudication as the price of parole. He could therefore argue for the same right as a person arrested on other grounds— the right to a judicial (not administrative) determination of probable cause to hold him, conducted within two days (not seven days) of the arrest, as required by *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991), and *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975); cf. *Hernandez v. Sheahan*, *supra*, 455 F.3d at 777; *Patton v. Przybylski*, 822 F.2d 697, 700-01 (7th Cir. 1987); *Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987); Fed. R. Crim. P. 32.1(a)(1). The argument could be bolstered by noting that Illinois law allows parole-violation warrants to be issued by parole officials, without any involvement of a judicial officer. 730 ILCS 5/3-14-2(c), -2(c-1); *People ex rel. Johnson v. Pate*, 265 N.E.2d 144, 146 (Ill. 1970); *People ex rel. Jefferson v. Brantley*, 253 N.E.2d 378, 379 (Ill. 1969).

Against this it can be argued that to entitle a person who is arrested for violating parole and claims mis-

taken identity to a judicial hearing would give every such arrestee a right to two hearings: a judicial hearing to verify his identity (for he could always deny that he was the person named in the warrant, though he would risk punishment for perjury if were lying) and, if his claim of mistaken identity was rejected, an administrative hearing to determine whether he had in fact violated his parole. Before a new constitutional right is declared, it would be prudent to inquire into the relative merits of judicial and administrative determinations of identities of alleged parole violators. We shouldn't disparage factfinding by nonjudicial hearing officers; much factfinding is delegated to them, on the theory that specialization in adjudicating a particular type of legal dispute may offset any disadvantages flowing from the lesser independence of such officers. And it is not always lesser: Illinois judges, unlike the parole board's hearing officers, are elected. Nor are issues of mistaken identity fraught with legal subtleties that only judges can plumb. It is far from clear, therefore, that there would be a gain in accuracy from requiring a judicial hearing on top of the administrative hearing that is already required, let alone a gain great enough to outweigh the administrative burden that such a requirement would place on the state—a state that happens to be on the brink of bankruptcy, if not over the brink.

In any event, there is no need to decide in this case whether there might be a constitutional entitlement to a judicial hearing in cases of alleged mistaken identity of parole violators. For even if the question were answered in the plaintiff's favor, it would not warrant

any relief. The question is novel, and the defendants therefore protected from liability for damages for possibly answering it incorrectly by the doctrine of qualified immunity. *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009); see *Pearson v. Callahan*, 129 S. Ct. 808, 818-22 (2009).

We are left with the claim that Atkins was so badly mistreated at Stateville that he was deprived of liberty without due process of law.

The complaint alleges that when he arrived at Stateville he was wearing a diamond stud in one of his ears. He swallowed it "to prevent the defendants from stealing his property." He was then "placed in a cell naked without a mattress, sheets, blankets, or water until [he] defecated his earring." We haven't been told why the prison wanted the earring, but probably prisoners are forbidden to wear jewelry, as it would invite theft and brawls, and jewelry often has sharp edges or a sharp pin and so can be used as a weapon. *Rowland v. Jones*, 452 F.2d 1005, 1006 (8th Cir. 1971) (per curiam). The complaint does not question the propriety of the defendants' insistence on recovering the earring, only the indignities allegedly inflicted on Atkins in the four days that he spent in a "dry cell" before the earring emerged.

The most serious indignities alleged—the only ones that might state a claim of constitutional magnitude—are that he was "denied drinking water and/or food for several days." Depriving a person of food for four days would impose a constitutionally significant hardship, *Reed v. McBride*, 178 F.3d 849, 853-54 (7th Cir. 1999); *Foster v.*

*Runnels*, 554 F.3d 807, 814-15 and n. 5 (9th Cir. 2009); *Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998); depriving him of all liquids for four days would be far worse. "A human can be expected to survive for weeks without food, but a thirsty person deprived of water would last [only] a matter of days." Jessica Hamzelou, "Nil By Mouth," *New Scientist*, Apr. 16, 2010, p. 37; see also *Survival Topics*, "How Long Can You Survive Without Water?" www.survivaltopics.com/survival/how-long-can-you-survive-without-water/ (visited Jan. 19, 2011).

Although "several days" could as a semantic matter be more than four, the allegation that Atkins was "placed in a cell naked without a mattress, sheets, blankets, or water *until* [he] defecated his earring" (emphasis added) implies that these deprivations would end when the earring finally emerged, and that, the complaint alleges, was on the fourth day. The complaint also alleges that Atkins "agreed to drink milk to cause the defecation, though he was lactose intolerant," so he was not denied liquids for four days; his complaint contains an internal contradiction. If he defecated on the fourth day, he must have drunk milk earlier that day, or on a previous day.

The allegation that he was deprived of food and water for several days is not inconceivable, which is the traditional standard for rejecting factual allegations in a complaint out of hand and dismissing the suit, as illustrated by *Best v. Kelly*, 39 F.3d 328, 330 n. 3 (D.C. Cir. 1994), which approved the dismissal of a claim that a "Branch of the Government, took my Face off of my Head, went

into my Scull & Put a Computer Chip of some kind & a Camera System which makes me Project Images or Pitchers, many Feet in Front of me." And in *Lee v. Clinton*, 209 F.3d 1025, 1025 (7th Cir. 2000), we upheld the dismissal of "two insane complaints charging the United States and China with a conspiracy to 'bio-chemically and bio-technologically infect and invade' various people including Lee with a mind reading and mental torture device that Lee calls 'Mind Accessing and Torturing via Remote Energy Transferring (MATRET).' To elude MATRET, Lee claims to have developed a variety of space technologies, oddly including an email system and nanny services, that will enable the victims of MATRET to relocate to MATRET-free planets." The claims described in *Best* and *Lee* fall into the category of the "essentially fictitious," a category of claims that does not engage the jurisdiction of the federal courts. *Bailey v. Patterson*, 369 U.S. 31, 33 (1962); see *Hagans v. Levine*, 415 U.S. 528, 536-37 (1974). It would be strange to think that such cases could not be dismissed without putting the parties to the burden of further pleading, of discovery, and perhaps even of trial (though such trials would be fun).

The allegation about Atkins's being deprived of food and water for four days is not in that class. It is not impossible; it is merely implausible. But it is *highly* implausible. Remember that the indignities to which the prison guards allegedly subjected Atkins are said to have been incidental to their desire to recover his earring. Deprivation of food and liquids would retard rather than accelerate the fulfillment of that desire. And we know that he was not denied all liquids, which is the pertinent

category (not water), because the complaint alleges that
he drank milk. In addition there is no allegation that he
incurred any physical injury from the alleged deprivations.

All three amended complaints imply, fantastically, that
Atkins was forced to remain naked for the entire 37 days
of his incarceration, for they state that the defendants
violated his civil rights by "forcing him to *remain* naked
in a cell" (emphasis added). But even if all that is meant
is that he was intermittently forced to remain naked,
this is hard to believe. Nor is the nakedness alleged
merely incidental to the conducting of frequent strip
searches, for that is a separate allegation, and the allega-
tion that he was forced to remain naked is bracketed
with an allegation that the defendants "den[ied] him
clothes."

There is also a curious evolution of allegations in suc-
cessive iterations of the complaint. The initial complaint,
though it alleged that Atkins had been denied drinking
water until he defecated his earring, did not mention
any deprivation of food but instead alleged that "for the
first couple of days at Statesville [*sic*], [he] did not eat
because the defendants wrongfully desired to obtain
[his] earring." This suggests that any deprivation of food
was short-lived and self-inflicted.

The four successive complaints are riddled with contra-
dictions. And they are not pro se complaints. They
were drafted by the plaintiff's lawyer. We have noted
that the original complaint didn't mention deprivation
of food by the prison as distinct from Atkins's refusing
to eat for two days. The first amended complaint dropped

all reference to deprivation of food or drink, while the second amended complaint restored the claim that Atkins had been "denied drinking water" but said nothing about food. Not until the third amended complaint do we read that Atkins was denied "food and/or water," which still leaves unclear whether it was one or both. And the response to the defendants' motion to dismiss that complaint muddied the waters further by stating that the defendants had "deprived him of water and/or food for several days and [made] him drink milk." Milk is not water, but it is a substitute for water. The plaintiff's final submission to the district court listed all the ways in which the "defendants forced [Atkins] to endure unconstitutional mistreatment" but did not include in the list deprivation of food or water.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), require that a complaint be dismissed if the allegations do not state a plausible claim. The Court explained in *Iqbal* that "the plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 1949. This is a little unclear because plausibility, probability, and possibility overlap. Probability runs the gamut from a zero likelihood to a certainty. What is impossible has a zero likelihood of occurring and what is plausible has a moderately high likelihood of occurring. But one sees more or less what the Court was driving at: the fact that the allegations undergirding a plaintiff's claim could be true is no longer enough to save it. *Twombly* and *Iqbal* do not reject the principle that when a complaint is dismissed

for failure to state a claim the reviewing court is to assume that the factual allegations made in the complaint (unless fantastic, or contradicted in the complaint itself or in documents attached to it) are true. But the complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as "preponderance of the evidence" connote. *Iqbal* like this was a case in which the defendants were public officers entitled to immunity from damages liability if they were acting in good faith. The earlier a case is dismissed, the more meaningful the immunity.

When the Court said in *Iqbal* "we do not reject these bald allegations on the ground that they are unrealistic or nonsensical," *id.* at 1951, it didn't mean that nonsensical allegations can survive a motion to dismiss; that wasn't the rule even before *Twombly* and *Iqbal*. The point was rather that the allegations in *Iqbal*, though somewhat paranoid, were not nonsensical; nevertheless the Court ordered dismissal.

After *Twombly* and *Iqbal* a plaintiff to survive dismissal "must plead some facts that suggest a right to relief that is beyond the 'speculative level.'" *In re marchFIRST Inc.*, 589 F.3d 901, 905 (7th Cir. 2009). And (another rule that antedates *Twombly* and *Iqbal*) he can plead himself out of court by pleading facts that show that he has no legal claim. *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008); *EEOC v. Concentra Health Services, Inc.*, 496 F.3d 773, 777 (7th Cir. 2007); *Orthmann*

*v. Apple River Campground*, 757 F.2d 909, 915 (7th Cir. 1985); *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006). So suppose some of the plaintiff's factual allegations are unrealistic or nonsensical and others not, some contradict others, and some are "speculative" in the sense of implausible and ungrounded. The district court has to consider all these features of a complaint en route to deciding whether it has enough substance to warrant putting the defendant to the expense of discovery, *Bell Atlantic Corp. v. Twombly, supra*, 550 U.S. at 558-59; *Francis v. Giacomelli*, 588 F.3d 186, 193 and n. 2 (4th Cir. 2009), or, in a case such as this (like *Iqbal* itself), burdening a defense of immunity. *Ashcroft v. Iqbal, supra*, 129 S. Ct. at 1953-54; *Smith v. Duffey*, 576 F.3d 336, 339-40 (7th Cir. 2009); *Amore v. Novarro*, 624 F.3d 522, 529-30 (2d Cir. 2010); *Fletcher v. Burkhalter*, 605 F.3d 1091, 1095-96 (10th Cir. 2010).

We are left in darkness as to whether the plaintiff is actually alleging that Atkins was denied food or water for four days, or for a lesser, but still constitutionally significant, length of time. The plaintiff's lawyer has had four bites at the apple. Enough is enough. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378-79 (7th Cir. 2003).

All this is apart from the futility of the suit. Atkins is the only witness for the plaintiff, and Atkins is dead. His widow would be happy to testify to what he told her had happened to him, but her testimony would be inadmissible hearsay. There is no other evidence to support the charge of unconstitutional conditions of confinement,

and no suggestion that any defendants, or other members of the prison staff, are prepared to support the plaintiff's version of the facts—or, should we say, any one of the plaintiff's versions.

The district court was correct to dismiss the suit.

AFFIRMED.

HAMILTON, *Circuit Judge*, concurring in part and concurring in the judgment. I join the majority opinion in affirming the dismissal of Atkins' claims regarding his arrest and the conditions of his detention. I would resolve differently, however, Atkins' due process claim against the individual state officials. In my view, Atkins alleged sufficiently that he was deprived of liberty without due process of law when he was held by the state for more than 48 hours without a hearing before a judge. He was entitled to a hearing in which he could have shown that he was not the same William Atkins sought on the parole violation warrant or, if perhaps he was indeed the William Atkins sought (we cannot tell from the sparse record), that he was no longer on parole at the time of the alleged violation. I agree with my colleagues, however, that the individual defendants are entitled to qualified immunity on that claim because

the law was not and still is not sufficiently clear to impose individual liability under 42 U.S.C. § 1983. I therefore concur in the judgment to affirm dismissal of the claim.

This case has been unnecessarily challenging because, as my colleagues point out, the attorney for the late Mr. Atkins has buried one solid claim in a crowd of hopeless claims against virtually every potential defendant in sight. The suggestion, for example, that every prison or jail employee risks personal liability if he does not investigate an inmate's claim of innocence is beyond frivolous. Despite these distractions, there is a real and serious due process problem in the possibility for mistaken identifications under parole violation warrants.

The problem is this. Law-abiding persons often have encounters with police officers during which they provide basic identifying information. The police are free to check this information against any outstanding warrants, including those for parole violations. Suppose that, during that check, the police come across a warrant bearing the same name and some other identifying information. Even if the identifying information does not match perfectly, as it did not in Atkins' case, the police officers on the scene may reasonably arrest the person over his protests that he is a different person.

So far, none of this is controversial, but we know that mistakes are made in such arrests. What process is due to the person who claims he has been wrongly identified? Typically, a person arrested without a warrant from a magistrate is entitled to (1) a hearing (2) before a judicial

officer where a wrong identification could be addressed (3) "promptly after arrest." See *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). Under this promptness standard, "judicial determinations of probable cause within 48 hours of arrest will, as a general matter," suffice unless the prisoner can prove unreasonable delay. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991); but see *id*. at 71 (Scalia, J., dissenting) ("Hereafter a law-abiding citizen wrongfully arrested may be compelled to await the grace of a Dickensian bureaucratic machine, as it churns its cycle for up to two days—never once given the opportunity to show a judge that there is absolutely no reason to hold him, that a mistake has been made."). This 48-hour standard is well-established. State courts and local police and jail officers comply with it routinely. A law-abiding citizen who has been misidentified is therefore vulnerable to only a relatively brief detention before he may insist on having a judge take a close look at a claimed misidentification.

The process due to a parolee arrested on a charge of parole violation is quite different. In such cases, a prelimi-nary hearing "to determine whether there is probable cause" to detain the arrestee need be held only "as promptly as convenient after arrest while information is fresh and sources are available." *Morrissey v. Brewer*, 408 U.S. 471, 485 (1972). In Atkins' case, it was a full seven days before he had even that preliminary hearing. Delays as long as 24 days between the arrest and even the preliminary hearing are constitutionally permissible, even without any showing of emergency or extraordinary circumstance. See *Faheem-El v. Klincar*, 841 F.2d 712, 714-

15, 723 (7th Cir. 1988) (en banc). While the probable cause determination "should be made by someone not directly involved in the case," the hearing officer "need not be a [neutral and detached] judicial officer" and may be an administrative official such as a parole officer. *Morrissey*, 408 U.S. at 485-86.

The reason we tolerate the slower and different procedures for parolees is precisely because they are parolees. They have already been convicted of a crime through the full processes of the criminal law. Their interest in liberty is much more limited than for the vast majority of citizens who are not on parole. These limitations and their importance to the due process calculus are woven throughout the Supreme Court's opinion in *Morrissey*, which balanced competing interests and found the slower, more limited procedures permissible for parole revocation proceedings. "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." 408 U.S. at 480.

When Atkins was arrested, though, the pivotal issue was whether he was actually an individual on parole. *Morrissey* and its progeny dealing with parolees never address this narrow issue. Those cases all operate on the justifiable assumption that the right person has been arrested—someone actually on parole, subject to restrictions on liberty. That's precisely why those decisions tolerate the slower review processes. That reasoning simply does not extend to the issue of what processes are

necessary to determine whether an arrested person is actually on parole. If that question of identity—is the arrested person actually the parolee sought by the warrant?—is subject to only the much slower *Morrissey* procedures, then any law-abiding citizen faces not just 48 hours of detention, decried by Justice Scalia but accepted by a majority of the Supreme Court in *McLaughlin*, but perhaps weeks of unjustified detention without any right to a hearing before a judge.

Because an arrestee's identity—parolee or average citizen—determines whether he is entitled to the 48-hour *Gerstein-McLaughlin* processes or the much slower *Morrissey* processes, I conclude on the merits of Atkins' case that due process of law requires greater procedural protection to guard against cases of mistaken identity in the context of parole-violation warrants. Cf. *Patton v. Przybylski*, 822 F.2d 697, 700-01 (7th Cir. 1987) (noting that "to arrest a person over his vigorous protest that he is the wrong man . . . and keep him in jail [for almost a week] without either investigating the case or bringing him before a magistrate raises serious constitutional questions . . . under the due process clause"); *Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987) ("[A] prolonged confinement of an arrested person without a hearing to determine whether he is the person named in the warrant would be a deprivation of liberty without due process of law . . . .").

To decide how much process is due, the familiar three-part *Mathews v. Eldridge* analysis provides the framework. 424 U.S. 319, 334-35 (1976). We consider (1) the private

interest that will be affected by the government action; (2) the risk of an erroneous deprivation with the procedures in place and the probable value of different procedures; and (3) the government's interest, including the costs of different procedures. See *Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006) (applying *Mathews* to analysis of detainee's claim of mistaken identity after he had appeared before judge).

First, the private interest at stake here is significant: basic liberty, for a period that can be measured in weeks. While an innocent person is being held in prison for weeks, his entire life can be disrupted—by loss of a job, inability to support and care for loved ones, inability to tend to financial affairs, and on and on. That is why *Gerstein* and *McLaughlin* tolerate no more than 48 hours delay before an arrestee must be brought before a judge. But an arrestee mistakenly identified as a parole violator may be wrongfully incarcerated without a hearing for much longer than the 48 hours tolerated for ordinary arrests.[1]

---

[1] The difference between the permissible initial detention times before a preliminary hearing for average citizens (two days) and parolees (the 24 days we found acceptable in *Faheem-El*) is enough to distinguish those cases rejecting requests for stricter jailhouse procedures to prevent misidentifications in the context of the typical warrantless arrest. See, *e.g.*, *Hernandez*, 455 F.3d at 775 ("a police department is not required to be credulous but may limit its attention to information it deems reliable—especially because

(continued...)

Second, while the risks of an error are difficult to quantify on this record, where the claim was resolved without a trial, they are likely to be significant. Justice Stevens suggested in a similar case that the risk of misidentifications based on coincidental similarity of names, birthdays, and descriptions is "unquestionably substantial." *Baker v. McCollan*, 443 U.S. 137, 155-56 (1979) (Stevens, J. dissenting).[2] In this case, the coincidence of the similar birth dates and Social Security numbers may help to explain plaintiff Atkins' unfortunate experience.[3] As my colleagues point out, police officers on the street are entitled to reasonable latitude in executing arrest warrants. See *Patton*, 822 F.2d at 699-700 (affirming dismissal

---

[1] (...continued)
detention on the police department's resolution cannot exceed 48 hours").

[2] The man arrested in *Baker v. McCollan* was in fact the person identified in an arrest warrant that had been issued by a judicial officer. 443 U.S. at 140-41. The man's brother had stolen his identification and had given law enforcement officials the wrong identity when he had been arrested. In Atkins' case, the parole violation warrant was issued not by a judicial officer, but by parole officials.

[3] The fact that the two William Atkinses shared the first three digits in their Social Security numbers does not help with identification. It means only that both were assigned their numbers in the same geographic region. See *Social Security Administration, Frequently Asked Questions, Answer #18*, www.ssa.gov/history/hfaq.html (last visited Jan. 19, 2011).

of claim against police officer who arrested person with same name, race, and year of birth as person in warrant, but with different date of birth and address); see generally *California v. Hill*, 401 U.S. 797, 803-04 (1971) (police acted reasonably and in good faith in arresting the wrong person). This is because law enforcement officers making arrests in the field will often have little information at hand to be absolutely sure whether they have arrested the proper individual.

The logical and practical consequence of giving police officers room to make mistakes is that there will be more mistakes. More innocent people will be arrested. And when, as was the case here, one unit of government (the City of Chicago) makes an arrest on behalf of another unit of government (the State of Illinois), the risk of miscommunications and mistaken identifications is enhanced.

Regarding the third *Mathews* factor, the government's interests do not weigh against a prompt judicial hearing to determine whether a person arrested on a parole warrant is in fact the parolee sought. The government has a powerful interest in speedy, accurate resolutions of alleged misidentifications. If the wrong person has been arrested on the warrant, it means that the right person remains at large, possibly endangering others. Moreover, it would not unreasonably burden government resources to make a quick determination whether an individual arrested on a parole violation warrant is the same person whose parole is already being closely monitored by the authorities. Parolees have already been convicted. All

of their pertinent identifying information should be readily available from the original incarceration. Probable cause to believe the person being held is the parolee sought could often be established by as little as the testimony of the supervising parole officer.[4] This case illustrates the ease with which a misidentification of a parolee can be confirmed. According to the Prisoner Review Board's eventual order to release Atkins from custody, "documents and a call to the records office" were enough to confirm that Atkins was not in fact on parole.

Upon weighing the three *Mathews* factors, I believe that due process requires some minimal judicial procedures to ensure against mistaken misidentifications in the context of parole violation warrants. This is not a radical conclusion—the Federal Rules of Criminal Procedure already provide this basic protection to persons arrested on federal warrants for violation of supervised release (equivalent to parole for these purposes) or probation. Rule 32.1(a)(1) requires that a person "held in custody for violating probation or supervised release must be taken without unnecessary delay before a magistrate judge." And when the person is in custody in a different federal

---

[4] On our limited record, we are left to wonder where the suspected Atkins' parole officer was during the five weeks that plaintiff Atkins was in custody. That officer presumably could have straightened out this matter immediately. According to the hearing officer's report of findings made after Atkins' preliminary parole violation hearing, however, the only person who testified at that preliminary hearing was plaintiff Atkins himself.

court district, the rule specifically requires the magistrate judge to find whether "the person is the same person named in the warrant." Fed. R. Crim. P. 32.1(a)(5)(B)(ii). I am not suggesting that every detail of Rule 32.1 is constitutionally mandated, but a prompt appearance before a judge is needed to provide the process due when there is a claimed misidentification of the person in custody.[5]

My colleagues ultimately decline to decide the merits of Atkins' due process claims but rely on the defense of qualified immunity to affirm the dismissal. I agree that qualified immunity applies and therefore concur in that portion of the opinion and in the judgment. But I believe

---

[5] *Baker v. McCollan*, 443 U.S. 137 (1979), does not lend support to the procedures used here. The Supreme Court held in *Baker* that the person named in an arrest warrant issued by a judicial officer did not have a viable § 1983 claim against the sheriff who kept him in custody under the warrant without bringing him before a court over a three-day holiday weekend. Crucial to the Court's analysis in *Baker* was the fact that the arrest had been made based on a warrant issued by a judge. *Id.* at 143-44. *Baker* also relied on the "reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers" in the constitutional system, *id.* at 145, but there is no such division of labor in the Illinois parole system. Parole violation warrants may be issued in Illinois without involving any judicial officers at all. 730 ILCS 5/3-14-2(c) & (c-1); see *People ex rel. Johnson v. Pate*, 265 N.E.2d 144, 146 (Ill. 1970). *Baker* also relied on the fact that "one detained [must] be accorded a speedy trial." 443 U.S. at 145. A hearing before a parole officer or a parole board is not the "trial" contemplated in *Baker*.

that we should address the merits, for both substantive and procedural reasons.

The substantive reasons are those I have explained above. My colleagues suggest, however, that we should know more about the relative merits of judicial and administrative decision-making before reaching the conclusion on the merits. After all, perhaps these identification issues are straightforward and suitable for administrative decision-making. Both judges and parole officials can make mistakes. The same argument could have been made in *Gerstein* and *McLaughlin*, however. The Supreme Court weighed the relevant constitutional interests in *Gerstein* and *McLaughlin*, and it chose judicial decision-making for good reasons. *Gerstein* and *McLaughlin* tell us that persons in the United States cannot be held in custody for more than 48 hours without requiring executive branch officials—like police or parole officers—to convince a judicial officer that there is good reason to hold the person. That rule does not disparage the abilities of executive decision-makers. The rule simply insists that executive branch actions to deprive a person of basic liberty must be subject to immediate and independent review. The rule recognizes human and institutional fallibility, as well as the value of review and accountability. Cf. *Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (enforcing search warrant requirement of the Fourth Amendment: "The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate. . . .").

If my conclusion on the merits of Atkins' claim is not correct, then an innocent, law-abiding person could be sent to prison without ever having a fact-finding hearing before a judge, let alone a jury trial. *Morrissey* allows administrative decision-makers to conduct both the preliminary and plenary hearings to revoke parole. 408 U.S. at 485-88. Judicial review can be limited to deferential review of the discretionary administrative decision. See *Black v. Romano*, 471 U.S. 606, 611-12 (1985) (identifying due process requirements that courts can enforce); *Luther v. Molina*, 627 F.2d 71, 75-76 (7th Cir. 1980) (decision to revoke parole was subject to deferential judicial review under Administrative Procedures Act). We accept those procedures for those who have already been convicted of a crime and have then been granted parole (or super- vised release, the modern federal parallel). But since *Gerstein*, courts have never held such procedures as suf- ficient to deprive an unconvicted person of his or her liberty for more than 48 hours.

My colleagues' doubts about the choice of decision- maker also do not address the timing issue. *Gerstein* and *McLaughlin* show us that the outer boundary for executive-branch detention, in all but the most unusual cases, is 48 hours. For persons actually on parole, we have held that detention for as long as 24 days is permis- sible without even a preliminary hearing before a parole official. *Faheem-El*, 841 F.2d at 714-15, 723. I think that result is clearly unconstitutional, under *Gerstein* and *McLaughlin*, as applied to a person who is not actually on parole.

There are also sound procedural reasons for deciding the merits before deciding qualified immunity here. After *Pearson v. Callahan*, 129 S. Ct. 808 (2009), we are not required to decide the merits before we decide qualified immunity, but the choice is left to our sound discretion. The two-step process set forth in *Saucier v. Katz*, 533 U.S. 194 (2001)—decide the merits and then qualified immunity—is "often beneficial" in promoting the development of constitutional precedent, especially with respect to "questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 129 S. Ct. at 818. This case fits that description.

Unless and until this view of the merits is accepted, law-abiding citizens who are not on parole remain vulnerable to lengthy deprivations of liberty without due process of law and without effective remedy. Individual defendants will be protected from damages liability by qualified immunity, while state governments are protected from damages liability by the limits of 42 U.S.C. § 1983 and the Eleventh Amendment. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). It will also be difficult to find an appropriate plaintiff in a case seeking injunctive or declaratory relief. Surely few law-abiding citizens would have in advance a well-founded fear of being subjected to the treatment that Atkins alleged. To obtain prospective relief, even someone who has experienced such treatment by mistake might well need to show that he has an objectively reasonable fear of being subjected to it again, which I expect would be difficult. See, *e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95 (1983) (ordering dismissal for lack of case or controversy; even if plaintiff was sub-

jected to illegal choke-hold by police in past, there was no real and immediate threat that it would happen to him again).

Returning to the specifics of this case, one of the mysteries here is why it took so long to straighten out Atkins' identity and status. My colleagues suggest that Atkins bears some responsibility for this because he gave inconsistent defenses at his preliminary hearing (before a parole official, seven days after his arrest). The defenses were, as far as I can tell, that the police had the wrong man and that plaintiff Atkins' earlier parole had expired. I do not see those defenses as inconsistent. We have some indication that plaintiff Atkins saw the computerized information that the police relied on to arrest him. If that is true, he could certainly have known whether or not he was in fact the correct William Atkins. Plaintiff Atkins also had in fact been on parole that expired several years earlier. An honest person in his predicament could quite reasonably volunteer that information to the hearing officer in the interest of full disclosure.[6]

---

[6] My colleagues also suggest that plaintiff Atkins was probably the right William Atkins sought under the parole arrest warrant. It is not clear how they reach that conclusion, however. Perhaps the parole records had the wrong birth date and the wrong Social Security number, making it only appear that they described a William Atkins other than the plaintiff. But it seems to me more likely, and at least equally plausible, that with a name as relatively common as William

(continued...)

For these reasons, although the district court's dismissal was correct based on qualified immunity, I would also hold that Atkins alleged sufficiently that his right not to be deprived of his liberty without due process of law was violated when he was held for so long without being brought before a judge to determine whether there was probable cause to believe he was in fact on parole and wanted under the parole violation warrant.

---

[6] (...continued)
Atkins, there simply were two different people, the plaintiff who had been on parole a few years earlier and another who was on active parole in 2003. In light of the district court's dismissal, we should take that portion of the complaint at face value and assume that the police arrested the wrong man.

---