In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3233

ESTATE OF JESSIE MILLER,
By Robert Bertram, Special
Administrator, et al.,

*Plaintiffs-Appellees*,

*v.*

RYAN TOBIASZ, et al.,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Western District of Wisconsin
No. 10 CV 807—**William M. Conley**, *Chief Judge*.

ARGUED FEBRUARY 24, 2012—DECIDED MAY 24, 2012

Before ROVNER and MANION, *Circuit Judges*, and
COLEMAN, *District Judge*.[*]

COLEMAN, *District Judge.* Jessie Miller committed
suicide while incarcerated at the Columbia Correctional

---

[*] The Honorable Sharon Johnson Coleman, District Judge
for the United States District Court for the Northern District
of Illinois, is sitting by designation.

Institute ("CCI"). Miller's minor siblings brought this action under 42 U.S.C. § 1983, claiming that Miller committed suicide after several staff members at CCI acted with deliberate indifference to Miller's serious medical condition involving a long history of suicide attempts, self-harm, and mental illness. The district court granted qualified immunity to the management level defendants, the Wisconsin Resource Center ("WRC") defendants, and the nurse who was called after Miller had committed suicide. The remaining defendants[1], including CCI staff members, Jennifer/Janel Nickel[2], Ryan Tobiasz, Lieutenant Boodry, Captain M. Johnson, Sergeant Severson, Officer Millard, Officer Herbrand, Officer Bath, and Officer Quade, seek interlocutory appeal from the district court's denial of qualified immunity. We affirm.

## I.  Background

The CCI defendants are allowed to bring this interlocutory appeal now because they are raising the question of whether they should have been dismissed based on the defense of qualified immunity. *See Mitchell v. Forsyth*, 472

---

[1] At oral argument, there appeared to be some disagreement about the number of defendants remaining in the case. Plaintiff suggested only Nickel, Tobiasz and the two guards on duty remain defendants. Defendants asserted that based on the District Court's ruling nine defendants remain.

[2] Nurse Nickel is referred to variously as Janel Nickel and Jennifer Nickel, and was previously unidentified Jane Doe.

U.S. 511, 525-26, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985). The issue of qualified immunity is "*immunity from suit* rather than a mere defense to liability," and thus we must determine its application as early in the proceedings as possible. *Saucier v. Katz*, 533 U.S. 194, 200, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001) (emphasis in original). The facts below are presented in the light most favorable to Miller.

Jessie Miller had suffered from mental health issues since the age of five. Over the years, Miller engaged in various types of self-harm and attempted suicide on several occasions. His mental health issues, self-harm and suicidal ideation were well documented. During his incarceration, Miller attempted suicide at Dane County Jail on November 10, 2007, and then again at Dodge Correctional Institute on June 4, 2008. Miller was transferred to WRC due to his suicide attempts. While at WRC, Miller continued to harm himself by swallowing razor blades and other sharp objects and banging his head against the walls. At some point, he stated that he would commit suicide if returned to a Wisconsin Department of Corrections facility. Three days after being transferred to CCI on June 19, 2009, Miller committed suicide by hanging himself with a bedsheet. He was twenty-two years old.

Miller's minor siblings filed the instant lawsuit on Miller's behalf alleging violation of Miller's Eighth Amendment rights based on defendants' deliberate indifference to Miller's serious medical condition (his mental illness and suicide risk). After obviously careful

consideration in a lengthy memorandum opinion and order, the District Court granted qualified immunity dismissal to seventeen of the approximately twenty-six defendants, including the management level defendants, WRC defendants and the nurse who was called after Miller had committed suicide. The appellants are CCI staff including the intake nurse (Nickel), the psychology associate (Tobiasz), and several prison guards that were on duty the night Miller committed suicide (Bath, Boodry, Herbrand, Johnson, Millard, Quade and Severson).

## II. Discussion

A complaint must be dismissed if the allegations do not state a plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009). "The Court explained in *Iqbal* that 'the plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Atkins v. City of Chicago*, 631 F.3d 823, 831 (7th Cir. 2011) (quoting *Iqbal*, 129 S. Ct. at 1949). As this Court recently explained in *Atkins*, "the fact that the allegations undergirding a plaintiff's claim could be true is no longer enough to save it." *Atkins*, 631 F.3d at 831. Thus, after *Twombly* and *Iqbal*, a plaintiff must plead facts that suggest a right to relief beyond the speculative level. *Id.* at 832.

Qualified immunity protects government officials from individual liability for actions taken while performing discretionary functions, unless their conduct

violates clearly established statutory or constitutional rights of which a reasonable person would have known. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). Thus, in order to determine whether a prison official is entitled to qualified immunity the Court has two tasks. First, taking the facts in the light most favorable to the plaintiff, we must determine whether a constitutional right was violated. Second, if the factual allegations demonstrate a constitutional violation, we then decide whether the right in question was clearly established at the time of the occurrence. *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). We review these issues *de novo*. *Jacobs v. City of Chicago*, 215 F.3d 758, 765 (7th Cir. 2000).

We therefore begin by examining whether the plaintiffs have alleged facts sufficient to plausibly support the claim that the CCI defendants' conduct violated Miller's constitutional rights. The same standard applies for pretrial detainees and incarcerated individuals, though pursuant to the Fourteenth Amendment rather than the Eighth Amendment. *See Payne v. Churchich*, 161 F.3d 1030, 1039-41 (7th Cir. 1998). The seminal case describing constitutional violations under the Eighth Amendment is *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In *Farmer*, the Supreme Court held that prison officials have a duty to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Id.* To determine whether an inmate's Eighth Amendment rights were violated by a deprivation, we examine the alleged violation both objectively and subjectively. "First, the

deprivation alleged must be objectively, sufficiently serious." *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (quoting *Farmer*, 511 U.S. at 832). "Second, the mental state of the prison official must have been 'one of deliberate indifference to inmate health or safety.'" *Id.*

In order to satisfy the first element, when a claim is based upon the failure to prevent harm, the plaintiff must show that the inmate was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* This Court has stated in numerous cases that, "suicide is a serious harm." *See, e.g.*, *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996); *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992). Under the second prong, "deliberate indifference", "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Sanville*, 266 F.3d at 734 (quoting *Farmer*, 511 U.S. at 837).

The question for us is whether, when viewing all well-pleaded allegations in the complaint and construing all reasonable inferences in the light most favorable to Miller, it is plausible that each of the defendants-appellants were subjectively aware of Miller's serious medical condition (i.e., that he was a suicide risk) and either

knowingly or recklessly disregarded it. If the answer to that question is yes, then plaintiff has adequately pleaded a constitutional violation and we ask whether the right was clearly established at the time of the incident.

The defendants-appellants are in different positions in terms of what they knew of Miller: Defendant Nickel, a registered nurse at CCI, reviewed Miller's chart upon his arrival from WRC, conducted the transfer screening, referred him to the Psychological Services Unit ("PSU") and checked "Yes" on the transfer form indicating that Miller was on psychological medications; Defendant Tobiasz, a psychological associate in the PSU at CCI, personally met with Miller after a referral from Nickel to determine whether he should be placed in Disciplinary Segregation or within CCI's Special Management Unit ("SMU"); Bath, Boodry, Herbrand, Johnson, Millard, Quade, Severson were the prison security staff on duty the day of Miller's suicide. Millard made rounds in the SMU at 11:00 p.m. on the night in question and saw Miller on the floor of his cell but that nothing appeared amiss. Severson found Miller on the floor with no pulse and a ligature around his neck at 11:58 p.m. Quade arrived next, called the control booth, and asked why no alarm had sounded. Bath arrived to see Miller lying on his back with white cloth around his neck and ran to the control booth to get a rescue knife. Boodry directed Bath to return to the control booth and get a shield before entering Miller's cell.

The first prong of the qualified immunity analysis requires the Court to determine whether plaintiff ade-

quately pleaded a constitutional violation against each defendant. It is plausible that both Nickel and Tobiasz had actual knowledge that Miller was a suicide risk. Nickel reviewed Miller's file that indisputably contained his history of self-harm and suicide attempts. While Tobiasz did not review Miller's file, he met with Miller and was aware of his history of self-harm and chose to place him in the SMU. Both the Supreme Court and the Seventh Circuit have held that "[i]f the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk." *Sanville*, 266 F.3d at 737 (quoting *Farmer*, 511 U.S. at 842). Thus, with respect to Nickel and Tobiasz this Court should proceed to determine whether they took reasonable steps to prevent the harm.

The complaint alleges that the security officers knew or should have known of Miller's mental illness and suicide attempts because he was adjudicated mentally ill, had court-ordered medications which he refused to take at 8:30 p.m. the night he died, and he had a well documented history of suicidal behavior. These allegations along with the fact that Miller was housed in the SMU, where inmates in need of greater supervision are placed, support the reasonable inference that the security officers were exposed to information concerning Miller's suicide risk. While discovery may prove otherwise, their knowledge of the risk can reasonably be inferred at this very early stage of the litigation.

The next part of the deliberate indifference analysis for determining whether plaintiff adequately pleaded a constitutional violation is whether the defendants took reasonable steps to prevent the harm. Plaintiff alleges that Nickel took no action to assure Miller's safety, but also alleges that she referred Miller to the PSU, noted that he should be on psychiatric medication and denied access to "incapacitating agents." Thus, according to the allegations in the complaint, Nickel did take some action. It is unclear what more Nickel had the authority to do. While she maybe could have communicated Miller's condition better, that is perhaps only negligence and even gross negligence does not state a claim for deliberate indifference. Yet, at the same time viewing the allegations in the light most favorable to plaintiff, it is plausible that Nickel's omission of Miller's condition and history from her transfer form constituted indifference to the risk of serious harm. With respect to Tobaisz, although his report suggests that he had not reviewed Miller's chart and file, presumably he would have greater access to Miller's chart and file from WRC as a medical professional than the security defendants. At the pleading stage, it is perhaps more prudent to allow plaintiff to proceed with discovery on this claim.

Plaintiff also alleges sufficient facts to suggest that the security defendants failed to take reasonable steps to prevent the harm. According to the complaint, the security officers failed to call for medical attention despite finding Miller with no pulse and not breathing on the floor of his cell with a white cloth wrapped around his neck. Plaintiff further alleges that the security officers

waited to assemble an entry team and then applied restraints before removing the ligature from around Miller's neck.

Having established that plaintiff has alleged facts that, if proven, show the defendants violated a constitutional right, we must evaluate whether they would be entitled to qualified immunity under the second prong of the qualified immunity analysis; that the constitutional right must be clearly established. The defendants urge this Court to apply a very high threshold for this prong. They argue for an examination of this prong in such a specific manner that virtually nothing besides intentionally harmful actions could be "clearly established." Under defendants' analysis, for a right to be clearly established there must be precedent holding that a prisoner has a constitutional right specific to the conduct alleged. However, the cases in this circuit have understood the term "right" in a broader sense. For example, in *Cavalieri v. Shepard*, we stated that the right that Cavalieri was asserting is "the right to be free from deliberate indifference to suicide." 321 F.3d 616, 623 (7th Cir. 2003) (citing *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992). Here, plaintiff asserts the same right. We therefore conclude that that right was clearly established in 2009 as it was in 1998. *See also Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001).

For the reasons stated herein, we affirm the denial of dismissal based on qualified immunity for the defendants-appellants.

AFFIRMED.

MANION, *Circuit Judge*, concurring in part, dissenting in part. I concur with the court's conclusion that, at this early stage of the proceedings, defendants Nickel, Tobiasz, Millard, and Severson should not be granted qualified immunity. As I see it, however, the remaining defendants (Bath, Boodry, Herbrand, Johnson, and Quade) are entitled to qualified immunity. Therefore, I concur in part and dissent in part.

Jessie Miller led a tragically short and troubled life. Exposed to cocaine while in utero, Miller was born into a broken home on December 3, 1987. He soon became a ward of the state and spent his childhood years rotating through 54 foster homes. Miller was also physically and sexually abused and, not surprisingly, developed numerous mental health issues. He jumped from the top of a three-story building at age 16, which signaled the genesis of what would become a veritable obsession with suicide attempts and ideation. Those attempts appeared to increase in frequency and severity after Miller was incarcerated, culminating in his final, successful attempt at the Columbia Correctional Institute ("CCI") on June 22, 2009.

As the court correctly notes, at this preliminary stage we must determine whether the plaintiff has pleaded "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court correctly recites the qualified-immunity standard; that is, we must determine whether a constitutional right

was violated and whether the right in question was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009).

The plaintiff claims that the defendants subjected Miller to cruel and unusual punishment under the Eighth Amendment, as applied to the states by the Fourteenth Amendment. Specifically, the plaintiff claims that the defendants deprived Miller of proper supervision and care. The Supreme Court has recognized that certain deprivations fall under the cruel-and-unusual rubric. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A deprivation claim has two elements, one objective and one subjective. First, the deprivation must be, objectively, sufficiently serious. Second, the prison official's subjective state of mind must have been one of deliberate indifference to an inmate's health or safety. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001).

There is no question that the first element was sufficiently pleaded. We have held elsewhere that the risk of suicide is a serious harm. *Id.* Therefore, where prison officials deprive a prisoner who has known suicidal tendencies of the necessary medical and preventive care, and then that prisoner actually commits suicide, the prisoner has suffered a serious harm and thus "clearly satisfies the first element." *Id.* The second element, however, requires a more in-depth analysis. We must look at each defendant to determine whether the plaintiff has sufficiently pleaded that they were deliberately indifferent to Miller's health and safety. In doing so, the court must apply the following standard:

"[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837. The question, then, is whether the plaintiff has sufficiently pleaded facts that support allegations that each official subjectively knew that there was a substantial risk that Miller would commit suicide, yet failed to take reasonable steps to prevent him from doing so. *Sanville*, 266 F.3d at 737.

As the court carefully notes, the plaintiff has pleaded sufficient facts to show that Nickel and Tobiasz were aware, or should have been aware, of Miller's condition and that they recognized his need for heightened care and scrutiny. Therefore, the court correctly affirmed the district court's denial of qualified immunity. Perhaps Millard and Severson did not have the same detailed knowledge of Miller's condition, but it is reasonable at this stage of the proceedings to impute knowledge of Miller's suicidal tendencies to those two officers who were on patrol in the area of the prison where Miller was incarcerated—Housing Unit 7 of the Special Management Unit—just before and at the time Miller's suicide occurred. I agree that the plaintiffs have pleaded sufficient facts that, taken as true, could indicate a failure of either or both of them to prevent Miller's suicide.

Therefore, I join the court's opinion to deny qualified immunity to Millard and Severson at this preliminary stage.

But it is clear from the pleadings and the attached documentation that defendants Bath, Boodry, Herbrand, Johnson, and Quade were not patrolling Housing Unit 7 on the night that Miller committed suicide. Rather, those defendants were assigned to other areas of CCI and only responded after Severson placed an emergency radio call after he found Miller unresponsive in his cell. The complaint contains no allegation that these response team officers even knew of Miller's existence—let alone his suicidal tendencies.

Yet the court imputes the same knowledge to the response team officers as it did to Millard and Severson simply because the complaint alleges that the response team officers knew or should have known of Miller's suicidal tendencies and the related warning signs. (Op. at 8.) That is not a plausible allegation, and the court should ignore it. We require "actual knowledge" on the part of prison officials to satisfy the subjective component of a deprivation claim. *Sanville*, 266 F.3d at 737. We may impute actual knowledge to prison officials "[i]f 'the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.' " *Id.* (quoting *Farmer*, 511 U.S. at 842). But the complaint does not point to any such circumstance in this case. The court's opinion would require prison security guards to have knowledge of every single inmate's health issues

in the entire facility—even those in areas of the facility that the officers are not patrolling. Moreover, prison security guards would need to gain that knowledge almost immediately on an inmate's transfer into the facility (recall that Miller committed suicide a mere three days after transferring to CCI). A fair reading of the "actual knowledge" standard does not stretch a security guard's responsibility that far.

But even if the response team officers could be charged with some knowledge of Miller's suicidal tendencies, the plaintiff still has not sufficiently pleaded that those officers acted unreasonably. The essence of the plaintiff's allegations against the response team officers is that the officers failed "to react quickly upon seeing an inmate with a bed sheet wrapped around his neck." The pleadings and supporting documentation do not support this conclusory assertion.

It is undisputed that Severson placed an emergency radio call at 11:58 p.m. on June 22, 2009, informing other officers that Miller was laying unresponsive in his cell. Officers Quade, Bath, Herbrand, and Boodry responded to Housing Unit 7 within a few minutes of this call. On arrival, Bath briefly returned to the control room to get a rescue knife while Boodry retrieved a plexiglass shield. Within four minutes of receiving the radio call, the officers performed an "emergency cell entry," securing Miller's body with restraints while cutting away the ligature from around his neck. All of this occurred without waiting for Johnson—the senior officer—who arrived on the scene at 12:07 a.m.

The plaintiff complains that the officers took too long to enter Miller's cell, alleging that Bath's and Boodry's retrieval of the rescue knife and plexi-glass shield caused an undue delay in reaching the unresponsive Miller. Further, the plaintiff alleges that the officers acted unreasonably in their attempts to prevent Miller's suicide because they restrained Miller before cutting away the ligature. Neither of these allegations, taken as true, supports the argument that the response team officers acted unreasonably. As we have noted elsewhere, "[a]ll that can be expected is that guards act responsibly under the circumstances that confront them." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). This necessarily requires guards to "discriminate between serious risks of harm and feigned or imagined ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day's work." *Id.* Because the alleged time period between the emergency radio call and the response team's entry into Miller's cell was so short, and the officers' alleged actions that caused the minor delays were eminently reasonable and necessary to ensure the officers' (and Miller's) safety, the plaintiff has failed to plead sufficient facts that, even taken as true, could plausibly show that the response team officers failed to take reasonable steps to prevent Miller's suicide.

In sum, I concur with the court's conclusion that defendants Nickel, Tobiasz, Millard, and Severson are not entitled to a qualified-immunity defense at this stage of the proceedings. But based on the foregoing analysis, the response team officers—Bath, Boodry, Herbrand,

Johnson, and Quade—are entitled to qualified immunity. Therefore, I respectfully dissent from that part of the court's opinion.